# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| NEIL RUSH, a single person, | ) |
| | ) DIVISION ONE |
| Appellant, | ) |
| | ) No. 72424-0-I |
| v. | ) |
| | ) |
| WILLIAM I. BLACKBURN and JANE | ) |
| DOE BLACKBURN, and the marital | ) |
| community composed thereof, dba, | ) |
| TOP NOTCH TOWING, a Washington | ) PUBLISHED OPINION |
| company, | ) |
| Respondents, | ) |
| | ) |
| STEVEN JABLINSKE and JANE DOE | ) |
| JABLINSKE, and the marital community | ) |
| composed thereof, and HARTFORD | ) |
| UNDERWRITERS INSURANCE | ) |
| COMPANY, a foreign insurance | ) |
| company, | ) |
| | ) |
| Defendants. | ) FILED: November 2, 2015 |
| | ) |

DWYER, J. — Neil Rush's vehicle was towed and impounded by William

Blackburn, dba Top Notch Towing. Rush prevailed at a statutory impound

hearing contesting the impoundment. Before the district court rendered its

decision in the impoundment matter, however, Blackburn sold Rush's vehicle at

auction. Rush then filed a lawsuit against Blackburn in the superior court,

asserting claims for conversion and violation of the Consumer Protection Act,

chapter 19.86 RCW (CPA). After Blackburn did not appear, a default judgment was entered against him. More than a year later, after Rush had filed supplemental proceedings to enforce the default judgment, Blackburn moved the superior court to vacate the default judgment against him and for summary judgment on the CPA claim. The court granted both motions. We now affirm, in part, and reverse, in part.

I

*A. The tow, the impound, and the auction*

On Saturday, August 27, 2011, Rush's 1983 Mercedes Benz was illegally towed, at the request of Steven Jablinske, and taken to Top Notch Towing's impound lot. At the time the impound was requested, the vehicle was parked, with permission, on a private property easement.

On Monday, August 29, Top Notch mailed a notice of impound to Rush's Mountlake Terrace residence. Approximately four days after the vehicle was impounded, Rush contacted Top Notch and was told that he would have to pay $700 to obtain the release of his vehicle. Rush then contacted an attorney to assist him in recovering the vehicle. On September 2, Rush's attorney faxed a letter of representation to Top Notch asking that all communications be made through the law firm. On September 7, Rush received, and signed for, a certified letter and notice of vehicle impound from Top Notch.

On September 9, Rush hand delivered an impound hearing request form to Nicole Blackburn, Top Notch's manager and the daughter of Top Notch's

owner, William Blackburn.[1] Nicole Blackburn signed the form and made a copy for Top Notch's files. That same afternoon, Rush took the executed hearing request form to the Everett District Court, paid a $73 filing fee, and filed the impound hearing request with the court clerk.

On September 14, the clerk of the Everett District Court mailed, via regular mail, notices of civil hearing to Top Notch, Jablinske, and Rush.[2]

On October 11, Blackburn sold Rush's vehicle (and 11 other impounded vehicles) to himself at auction for $1 each. Although Blackburn had Rush's (and Rush's attorney's) contact information for more than a month prior to the sale, he did not notify either of them that an auction was going to take place.

On November 3, Rush, his attorney, and Jablinske appeared and presented evidence at an impound hearing in the Everett District Court. Blackburn failed to appear at the hearing. On November 15, the Honorable Tam T. Bui, Everett District Court judge, issued a memorandum decision finding that Jablinske's private impoundment of Rush's Mercedes violated RCW 46.55.120. The court ruled:

> Under RCW 46.55.120(3)(e), Mr. Rush is entitled to the filing fee of $73.00, and reasonable damages for loss of the use of his vehicle from 8/27/2011 - 10/11/2011, at $25 per day, in the amount of $1,150.00.

Pursuant to the district court's ruling, Jablinske was ordered to pay Top Notch the impoundment and storage charges incurred and Rush was authorized

---

[1] Hereinafter, unless the context dictates a need for greater specificity, the names Blackburn and Top Notch will be used interchangeably.

[2] "The court, within five days after the request for a hearing, shall notify the registered tow truck operator, the person requesting the hearing if not the owner, the registered and legal owners of the vehicle . . . and the person or agency authorizing the impound in writing of the hearing date and time." RCW 46.55.120(3)(a).

to redeem his vehicle from Top Notch without the payment of any costs. Shortly after this order was entered, Rush and his attorney learned for the first time that Blackburn had already sold at auction Rush's vehicle.

B. *The instant lawsuit—the default judgment against Blackburn*

On December 16, Rush filed a lawsuit in King County Superior Court against his auto insurance company, Hartford Underwriters Insurance Company (Hartford), Jablinske, and Top Notch Towing. Rush alleged, inter alia, that Top Notch had wrongfully sold his vehicle.

On December 27, Rush filed his first amended complaint,[3] again alleging, inter alia, that Top Notch had wrongfully sold his vehicle. Copies of this complaint and a summons were served upon Blackburn on January 4, 2012. Blackburn was required to answer Rush's complaint by January 25, but, as he had done with the impound hearing notice, Blackburn simply ignored the summons and failed to appear, plead, or otherwise defend the lawsuit, even after proper service.

On April 27, 2012, Rush filed his second amended complaint. Therein, Rush once again alleged that Blackburn had wrongfully sold Rush's vehicle. For the first time, Rush also asserted that the allegedly wrongful sale violated the CPA.

This complaint alleged, in pertinent part:

5.3 Defendant Top Notch wrongfully sold Rush's 1983 Mercedes Benz automobile at public auction prior to the issuance

---

[3] This complaint named "William I. Blackburn and Jane Doe Blackburn, and the marital community composed thereof, dba, Top Notch Towing" as a defendant, rather than simply Top Notch Towing.

- 4 -

of Judge Bui's Impoundment Hearing Order. At the time of the auction, Top Notch had notice of the pending hearing.

. . . .

5.5 Top Notch's sale of the automobile when the hearing was pending was an unfair and deceptive act or trade practice, constituting a violation of the Consumer Protection Act.

On March 26, a default judgment was entered against Jablinske.

On May 6, copies of Rush's second amended complaint and summons were served upon Blackburn. Blackburn was required to answer this complaint by May 26, but, again, Blackburn simply ignored the summons and failed to appear, plead, or otherwise defend the lawsuit, even after proper service.

On July 20, 2012, a default judgment was entered against Blackburn. On July 25, 2013 Rush voluntarily dismissed his claims against Hartford.

C. *Rush's default judgment against Top Notch vacated*

On August 20, 2013, Rush's attorneys sent a letter to Blackburn, enclosing a copy of the default judgment and demanding payment. Blackburn simply ignored the letter. Thereafter, Rush commenced enforcement of the judgment, bringing supplemental proceedings in the Snohomish County Superior Court. It was not until October 7, after Blackburn had been served with supplemental proceeding pleadings, that he made any response in the King County case.

On October 29, Blackburn brought a motion to vacate the default judgment, which was heard on November 13 by the Honorable Theresa Doyle, the same judge who had entered the default judgment. The trial court vacated the default judgment against Blackburn, finding:

1. There is substantial evidence to support at least a prima facie defense to Plaintiff's claims for conversion and a Consumer Protection Act violation;

2. Defendant Blackburn's failure to timely appear in the action, and answer the Complaint, was due to mistake and excusable neglect arising from Plaintiff's insurer's agreement to compensate Plaintiff for the loss of his vehicle;

3. Defendant Blackburn acted with due diligence after learning about the entry of the default judgment; and

4. No substantial hardship will result to Plaintiff by having to litigate his claims on the merits.

The Court further finds that there are existing sufficient extraordinary circumstances to warrant relief under CR 60(b)(II).

*D. Rush's CPA claim against Blackburn subsequently dismissed*

Thereafter, Blackburn moved for partial summary judgment, seeking dismissal of Rush's CPA claim. He asserted that summary judgment was proper because Rush did not establish (1) that Blackburn had engaged in an unfair or deceptive act or practice, or (2) that the alleged act or practice had a public interest impact.

On June 20, 2014, the trial court granted Blackburn's motion for partial summary judgment. The court, focusing on the public interest element, explained its ruling thusly:

> I don't find that the public interest element of the Consumer Protection Act claim is made, taking all of the evidence in the light most favorable to the nonmoving party. I don't find that this is a situation that's likely to be repeated or has been repeated. Mr. Blackburn's actions in selling the vehicles to himself, as cited by Mr. Rush's attorney Mr. Watkins, that's not illegal. The issue is selling the vehicle before the impound hearing occurred in this case, and I find that it's very unlikely to occur again. Therefore, the public interest impact element of a CPA claim is not met.

This appeal followed.

- 6 -

II

Rush first contends that the trial court erred by vacating his default judgment against Blackburn. This is so, he asserts, because an order pursuant to CR 60(b)(1) was time barred and the trial court did not make findings sufficient to support its order vacating the judgment under CR 60(b)(11). We disagree.

We review a trial court's ruling on a motion to vacate a default judgment for an abuse of discretion. Little v. King, 160 Wn.2d 696, 702, 161 P.3d 345 (2007). A trial court abuses its discretion only when its decision is manifestly unreasonable or is based on untenable grounds or untenable reasons. Luckett v. Boeing Co., 98 Wn. App. 307, 309-10, 989 P.2d 1144 (1999) (quoting Lane v. Brown & Haley, 81 Wn. App. 102, 105, 912 P.2d 1040 (1996)). Unchallenged findings of fact are verities on appeal. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 819, 828 P.2d 549 (1992). Unchallenged conclusions of law become the law of the case. King Aircraft Sales, Inc. v. Lane, 68 Wn. App. 706, 716, 846 P.2d 550 (1993).

Default judgments are generally disfavored in Washington. "We prefer to give parties their day in court and have controversies determined on their merits." Morin v. Burris, 160 Wn.2d 745, 754, 161 P.3d 956 (2007). "But we also value an organized, responsive, and responsible judicial system where litigants acknowledge the jurisdiction of the court to decide their cases and comply with court rules." Little, 160 Wn.2d at 703. "Our primary concern in reviewing a trial court's decision on a motion to vacate is whether that decision is just and equitable." TMT Bear Creek Shopping Ctr., Inc. v. PETCO Animal Supplies, Inc.,

140 Wn. App. 191, 200, 165 P.3d 1271 (2007). "'What is just and proper must be determined by the facts of each case, not by a hard and fast rule applicable to all situations regardless of the outcome.'" Griggs v. Averbeck Realty, Inc., 92 Wn.2d 576, 582, 599 P.2d 1289 (1979) (quoting Widucus v. Sw. Elec. Coop., Inc., 26 Ill. App. 2d 102, 109, 167 N.E.2d 799 (1960)). "Abuse of discretion is less likely to be found if the default judgment is set aside." Griggs, 92 Wn.2d at 582.

A default judgment may be set aside in accordance with CR 60(b). CR 60(b)(1) states, in relevant part:

> **(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud; etc.** On motion and upon such terms as are just, the court may relieve a party or his legal representative from a *final judgment*, order, or proceeding for the following reasons:
>
> (1) Mistakes, inadvertence, surprise, excusable neglect or irregularity in obtaining a judgment or order;
> . . . .
> The motion shall be made within a reasonable time and for reasons (1), (2) or (3) not more than 1 year after the judgment, order, or proceeding was entered or taken.

(Emphasis added.)

The key issue herein is whether Blackburn moved to vacate the default judgment more than one year after a final judgment was entered.

### A

Rush contends that the default judgment against Blackburn had been final for more than a year when Blackburn moved for its vacation.[4] He is incorrect.

---

[4] Rush's appellate argument is that, because the default judgment was entered on July 20, 2012 and Blackburn's motion to vacate was filed on October 29, 2013, more than a year had elapsed, rendering CR 60(b)(1) inapplicable.

CR 54(b) governs when a judgment upon multiple claims or involving multiple parties becomes final. It provides, in pertinent part:

> When more than one claim for relief is presented in an action . . . or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties *only upon an express determination in the judgment, supported by written findings, that there is no just reason for delay and upon an express direction for the entry of judgment.* . . . In the absence of such findings, determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties.

(Emphasis added.)

The default judgment against Blackburn was entered on July 20, 2012. At the time, there were claims remaining against Hartford.

The Blackburn default judgment provided, in pertinent part:

> THIS MATTER having come on regularly before the Court on plaintiff's Motion for Entry of Default Judgment against defendants William I. Blackburn and Jane Doe Blacburn (sic), dba, Top Notch Towing ("Top Notch"); the Motion for Default having been heard on July 20, 2012, an Order of Default having been entered on July 20, 2012, and NOW, THEREFORE, it is hereby
> ORDERED that judgment be entered in favor of plaintiff Neil Rush and against defendant Top Notch.

It did not contain either a finding that there was no just reason for delay or an express direction for the entry of judgment. Therefore, pursuant to CR 54(b), when entered, the default judgment against Blackburn was not a final judgment.

The order dismissing the remaining claims against Hartford, the remaining party, was entered on July 26, 2013. The default judgment against Blackburn became final on that date. Blackburn moved to vacate the default judgment against him on October 29, 2013. This was within a year of the default judgment

becoming a final judgment. Therefore, the trial court was not time barred from vacating the default judgment pursuant to CR 60(b)(1).

## B

The party seeking to vacate a default judgment pursuant to CR 60(b)(1) must establish:

> (1) That there is substantial evidence extant to support, at least prima facie, a defense to the claim asserted by the opposing party;[5] (2) that the moving party's failure to timely appear in the action, and answer the opponent's claim, was occasioned by mistake, inadvertence, surprise or excusable neglect; (3) that the moving party acted with due diligence after notice of entry of the default judgment; and (4) that no substantial hardship will result to the opposing party.

White v. Holm, 73 Wn.2d 348, 352, 438 P.2d 581 (1968).

Herein, the trial court "considered the factors justifying vacation of judgment as set forth in White v. Holm, 73 Wn.2d 348, 352, 438 P.2d 581 (1968)," and made the following findings of fact supporting its order vacating Rush's default judgment against Blackburn:

> 1. There is substantial evidence to support at least a prima facie defense to [Rush]'s claims for conversion and a Consumer Protection Act violation;
> 2. Defendant Blackburn's failure to timely appear in the action, and answer the Complaint, was due to mistake and excusable neglect arising from Plaintiff's insurer's agreement to compensate Plaintiff for the loss of his vehicle;
> 3. Defendant Blackburn acted with due diligence after learning about the entry of the default judgment; and
> 4. No substantial hardship will result to Plaintiff by having to litigate his claims on the merits.

Because Rush does not challenge any of these findings, they are verities on

---

[5] CR 60 now includes the same requirement. CR 60(e)(1) ("[I]f the moving party be a defendant, the facts constituting a defense to the action or proceeding" must be set forth in the motion to vacate.).

appeal. <u>Humphrey Indus., Ltd. v. Clay St. Assocs., LLC</u>, 176 Wn.2d 662, 675, 295 P.3d 231 (2013).

The trial court made the findings necessary to authorize vacation of a judgment based on mistake or excusable neglect, and those findings are verities on appeal. Therefore, the trial court did not abuse its discretion in vacating the default judgment against Blackburn.

III

Rush next contends that the trial court improperly granted summary judgment in Blackburn's favor on Rush's CPA claim. This is so, he asserts, because there is an issue of material fact regarding whether Blackburn engaged in an unfair or deceptive practice that affected the public interest. We agree.

We review de novo a trial court's order granting summary judgment. <u>Estate of Haselwood v. Bremerton Ice Arena, Inc.</u>, 166 Wn.2d 489, 497, 210 P.3d 308 (2009) (citing <u>Biggers v. City of Bainbridge Island</u>, 162 Wn.2d 683, 693, 169 P.3d 14 (2007)). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c); <u>Owen v. Burlington N. & Santa Fe R.R. Co.</u>, 153 Wn.2d 780, 787, 108 P.3d 1220 (2005). In determining whether a genuine issue of material fact exists, we view all facts and draw all reasonable inferences in favor of the nonmoving party. <u>Owen</u>, 153 Wn.2d at 787 (citing <u>Ruff v. King County</u>, 125 Wn.2d 697, 703, 887 P.2d 886 (1995)).

The CPA declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. The statute authorizes a private cause of action, stating: "'[a]ny person who is injured in his or her business or property' by a violation of the act may bring a civil suit for injunctive relief, damages, attorney fees and costs, and treble damages." Panag v. Farmers Ins. Co. of Wash., 166 Wn.2d 27, 37, 204 P.3d 885 (2009) (alteration in original) (quoting RCW 19.86.090). "To prevail in a private CPA claim, the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation. Panag, 166 Wn.2d at 37 (citing Hangman Ridge Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 784, 719 P.2d 531 (1986)). "Failure to satisfy even one of the elements is fatal to a CPA claim." Sorrel v. Eagle Healthcare, Inc., 110 Wn. App. 290, 298, 38 P.3d 1024 (2002) (citing Hangman Ridge, 105 Wn.2d at 793).

This appeal puts elements one and three at issue.

A

In his motion for partial summary judgment, Blackburn asserted that, as a matter of law, Rush could not establish that Blackburn had engaged in an unfair or deceptive act or practice.[6] We disagree.

A defendant's act or practice is per se unfair or deceptive if the plaintiff shows that it violates a statute declaring the conduct to be an unfair or deceptive act or practice in trade or commerce. Hangman Ridge, 105 Wn.2d at 786;

---

[6] The trial court's oral ruling granting summary judgment did not address this contention.

accord Klem v. Wash. Mut. Bank, 176 Wn.2d 771, 785-87, 295 P.3d 1179 (2013). If a defendant's act or practice is not per se unfair or deceptive, the plaintiff must show the conduct is "unfair" or "deceptive" under a case-specific analysis of those terms. Hangman Ridge, 105 Wn.2d at 786; accord Klem, 176 Wn.2d at 785-87. "Because the act does not define 'unfair' or 'deceptive,' this court has allowed the definitions to evolve through a 'gradual process of judicial inclusion and exclusion.'" Saunders v. Lloyd's of London, 113 Wn.2d 330, 344, 779 P.2d 249 (1989) (quoting State v. Reader's Digest Ass'n, 81 Wn.2d 259, 275, 501 P.2d 290 (1972), modified in Hangman Ridge, 105 Wn.2d at 786)).

The interpretative case law has established guiding criteria regarding what makes an act or practice "unfair." For example, in Magney v. Lincoln Mut. Sav. Bank, 34 Wn. App. 45, 659 P.2d 537 (1983), the court was guided by the following three criteria, which were utilized by the Federal Trade Commission to determine whether a practice or act is "unfair":

> "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness;[7] (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)."

---

[7] Indeed, our Supreme Court has recently decided a number of cases wherein it determined that acts or practices violating applicable statutes constituted unfair or deceptive practices, even though the relevant statutes themselves did not contain clauses declaring violations thereof to constitute per se violations. See, e.g., Lyons v. U.S. Bank Nat'l Ass'n, 181 Wn.2d 775, 786 n.5, 336 P.3d 1142 (2014) (regarding violations of the deeds of trust act, chapter 61.24 RCW (DTA)); Klem, 176 Wn.2d at 783-84 (regarding DTA violation and violation of statute governing notaries public); see also Panag, 166 Wn.2d at 53 ("While neither the [federal] F[air ]D[ebt ]C[ollection ]P[ractices ]A[ct] nor the [state] C[ollection ]A[gency ]A[ct] is directly applicable, these acts are nevertheless important to our analysis. Consumer debt collection is a highly regulated field. . . . reflecting the public policy significance of this industry.")

Magney, 34 Wn. App. at 57 (quoting Fed. Trade Comm'n v. Sperry & Hutchinson Co., 405 U.S. 233, 244 n.5, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972));[8] accord Klem, 176 Wn.2d at 786 (citing this portion of Magney with approval); Blake v. Fed. Way Cycle Ctr., 40 Wn. App. 302, 310, 698 P.2d 578 (1985) (relying on the same language from Sperry). Current federal law suggests that a "practice is unfair [if it] causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits." Federal Trade Commission Act of 1914, 15 U.S.C. § 45(n) (quoted in Klem, 176 Wn.2d at 787).[9]

The CPA also does not define the term "deceptive," but our Supreme Court has stated that "[d]eception exists 'if there is a representation, omission or practice that is likely to mislead' a reasonable consumer." Panag, 166 Wn.2d at 50 (quoting Sw. Sunsites, Inc. v. Fed. Trade Comm'n, 785 F.2d 1431, 1435 (9th Cir. 1986). To prove that a practice is deceptive, neither intent to deceive nor actual deception is required. Panag, 166 Wn.2d at 47, 63. The question is whether the conduct has the capacity to deceive a substantial portion of the public. Panag, 166 Wn.2d at 47. "[A]n act or practice can be unfair without being deceptive." Klem, 176 Wn.2d at 787.

"Whether undisputed conduct is unfair or deceptive is a question of law, not a question of fact." Lyons v. U.S. Bank Nat'l Ass'n, 181 Wn.2d 775, 786, 336

---

[8] In construing the CPA, we are guided by federal law. RCW 19.86.920 ("It is the intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts and final orders of the federal trade commission interpreting the various federal statutes dealing with the same or similar matters.")

[9] The quotation was accompanied by the following promise for future increased clarity: "This case does not give us an opportunity to explore in detail how to define unfair acts for the purposes of our CPA. That must wait for another day." Klem, 176 Wn.2d at 787-88.

P.3d 1142 (2014); accord Panag, 166 Wn.2d at 47 ("Whether a particular act or practice is 'unfair or deceptive' is a question of law." (quoting Leingang v. Pierce County Med. Bureau, Inc., 131 Wn.2d 133, 150, 930 P.2d 288 (1997))).

In his second amended complaint, Rush asserted that Blackburn's sale of Rush's automobile when the impoundment hearing was pending was an unfair and deceptive act or trade practice, constituting a violation of the CPA.

To evaluate this contention, we must first review the applicable statutory and regulatory framework. Chapter 46.55 RCW governs towing and impoundment. RCW 46.55.120, which governs disputed impoundments provides, in pertinent part:

> [(2)] . . . . (b) Any person seeking to redeem an impounded vehicle under this section has a right to a hearing in the district or municipal court for the jurisdiction in which the vehicle was impounded to contest the validity of the impoundment or the amount of towing and storage charges. . . . Any request for a hearing shall be made in writing on the form provided for that purpose and must be received by the appropriate court within ten days of the date the [notice and hearing request form were provided] and more than five days before the date of the auction. . . . If the hearing request is not received by the court within the ten-day period, the right to a hearing is waived and the registered owner is liable for any towing, storage, or other impoundment charges permitted under this chapter. Upon receipt of a timely hearing request, the court shall proceed to hear and determine the validity of the impoundment.
>
> (3)(a) The court, within five days after the request for a hearing, shall notify the registered tow truck operator.

RCW 46.55.130, which governs the notice requirements applicable to auctions of "unclaimed" vehicles, provides, in pertinent part:

> If, after the expiration of fifteen days from the date of mailing of notice of custody and sale . . . the vehicle remains unclaimed . . .

then the registered tow truck operator having custody of the vehicle shall conduct a sale of the vehicle at public auction.

In sum, an impoundment hearing must be requested within 10 days of the date on which a notice of impound is provided, the court has five days after a hearing has been requested to notify the tow operator, and the tow operator may not sell the vehicle until "after the expiration of [15] days." Thus, the statutory timeline is arranged so that a tow operator will receive notice of a properly requested impound hearing before an auction may lawfully be held.

While the applicable statutes do not explicitly state that a tow truck operator may not sell an impounded vehicle at auction while an impoundment hearing decision is pending, WAC 308-61-168 ("disputed impound") directly prohibits such action.[10]

> (1) Where a timely request has been made for a district or municipal court hearing and where the vehicle owner has failed to redeem the vehicle, the abandoned vehicle procedural requirements may be followed, but the sale of the vehicle at public

---

[10] Moreover, while the parties do not argue this point, the rule that a hearing must be held before impounded property is sold at auction to satisfy the debt to the tow operator is a function of due process. See Sniadach v. Family Fin. Corp., 395 U.S. 337, 89 S. Ct. 1820, 23 L. Ed. 2d 349 (1969) (prejudgment garnishment of alleged debtor's wages violates due process); Fuentes v. Shevin, 407 U.S. 67, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972) (invalidating statutes that allowed a creditor to require a state official to seize items from a defendant without advance notice); Mitchell v. W.T. Grant Co., 416 U.S. 600, 94 S. Ct. 1895, 40 L. Ed. 2d 406 (1974) (approved statutes allowing a credit seller/installment seller to cause government officials to repossess household items from a credit buyer without prior notice because seller had prior interest in property antagonist to buyer's interest); and N. Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 95 S. Ct. 719, 42 L. Ed. 2d 751 (1975) (invalidated statute that allowed creditor to garnish debtor's property upon filing of affidavit, because creditor lacked tangible prior interest in the property); see also Doug Rendleman, Analyzing the Debtor's Due Process Interest, 17 WM. & MARY L. REV. 35 (1975) (proposing a framework for determining the process due debtors when creditors seek to take debtors' property to satisfy debts). Any connection between Blackburn's regulatory violation and a violation of due process would, of course, be relevant to a determination of whether the behavior is unfair, given the inseparability of fairness from the requirements of due process. See Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 24-32, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981) ("[T]he phrase ['due process'] expresses the requirement of 'fundamental fairness.'").

auction must not take place until after the court has disposed of the request.[11]

WAC 308-61-168.

Herein, it is undisputed that (1) Rush paid all fees and followed all statutory requirements to challenge the illegal impound of his vehicle in court, (2) this included obtaining a signed impound hearing request form from Blackburn, (3) the district court clerk mailed Blackburn written notice of the impoundment hearing, (4) the district court ruled in Rush's favor, finding that the impound was illegal and that the vehicle should be returned to Rush without cost, (5) Blackburn never challenged the impoundment hearing order, (6) Blackburn auctioned Rush's vehicle before the impoundment hearing commenced and sold the vehicle to himself for $1, and (7) Blackburn had auctioned numerous other impounded vehicles to himself and his family members in similar $1 sales.

There are many reasons to conclude that Blackburn's actions herein constituted an unfair act or practice. By auctioning Rush's vehicle before the requested impound hearing was held and the matter decided, Blackburn indisputably violated WAC 308-61-168. Moreover, towing and impoundment is a highly regulated field, and the regulation that was violated is part of the system of statutes and regulations applicable to the industry. Together, these facts suggest that Blackburn's actions "'offend[ed] [established] public policy.'" Magney, 34 Wn. App. at 57 (quoting Sperry, 405 U.S. at 244 n.5).

---

[11] This regulation was specifically referenced in the hearing request form that Blackburn provided to Rush.

By depriving Rush of his vehicle, Blackburn also caused Rush substantial injury. Blackburn asserts that this injury was reasonably avoidable because Rush could have paid the $700 impoundment fee up front then later challenged the lawfulness of the tow. However, the legislature provided consumers the option of either paying for an impoundment up front and seeking reimbursement for an improper impound later, or enduring the temporary loss of a vehicle in order to avoid fronting the cost of an improper impound. Depriving consumers of this option, and putting the onus on consumers to pay a considerable—and sometimes unwarranted—sum up front, is contrary to the protective purpose of the CPA.

Furthermore, upon receiving the impound notice and impound hearing request forms that Blackburn provided Rush, both of which included a notification that the recipient thereof had a right to an impound hearing, "a reasonable consumer" likely would have been misled into believing that Blackburn was familiar with, and attentive to, the statutory and regulatory provisions applicable to tow truck operators. A reasonable consumer in that situation likely would have believed that Blackburn would not unlawfully sell the impounded vehicle while the consumer availed him- or herself of the statutory procedure for contesting the impound—of which Blackburn himself had notified the consumer.

Based on the foregoing, it is clear that, at the very least, Rush has established an issue of material fact as to whether Blackburn engaged in an unfair or deceptive act or practice.

B

Blackburn also contends that Rush failed to establish that the alleged unfair or deceptive act or practice had a public interest impact.[12] We disagree.

A CPA plaintiff may establish that an alleged unfair or deceptive act or practice is injurious to the public interest because it:

> (1) Violates a statute that incorporates this chapter;
>
> (2) Violates a statute that contains a specific legislative declaration of public interest impact; or
>
> (3)(a) Injured other persons; (b) had the capacity to injure other persons; or (c) has the capacity to injure other persons.

RCW 19.86.093; accord RCW 19.86.920 ("[T]he intent of the legislature [is] that this act shall not be construed to prohibit acts or practices . . . which are not injurious to the public interest.").

"The first two subsections of this statute reflect . . . that the public interest element can be satisfied per se where the plaintiff shows violation of a statute that contains a specific legislative declaration of public interest impact." Klem, 176 Wn.2d at 804 (Madsen, C.J., concurring). Subsection (3), by contrast, "bases public interest impact on actual injury and capacity to injure." Klem, 176 Wn.2d at 804 (Madsen, C.J., concurring).

For violations falling under subsection (3), "whether the public has an interest in any given action is to be determined by the trier of fact from several factors, depending upon the context in which the alleged acts were committed." Hangman Ridge, 105 Wn.2d at 789-90.

_____

[12] The trial court agreed with Blackburn.

- 19 -

Where the acts complained of involve "essentially a consumer transaction" such as the sale of goods, the following five factors are relevant:

(1) Were the alleged acts committed in the course of defendant's business? (2) Are the acts part of a pattern or generalized course of conduct? (3) Were repeated acts committed prior to the act involving plaintiff? (4) Is there a real and substantial potential for repetition of defendant's conduct after the act involving plaintiff? (5) If the act complained of involved a single transaction, were many consumers affected or likely to be affected by it?

Hangman Ridge, 105 Wn.2d at 790.

Where the complaint involves "essentially a private dispute" such as the provision of professional services, different factors are involved:

(1) Were the alleged acts committed in the course of defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions?

Hangman Ridge, 105 Wn.2d at 790-791.

Although the factors applicable vary and can depend on whether the situation involves a public transaction or a private dispute, "not one of these factors is dispositive, nor is it necessary that all be present." Hangman Ridge, 105 Wn.2d at 791. Instead, "[t]he [exemplar] factors . . . represent indicia of an effect on public interest from which a trier of fact could reasonably find public interest impact." Hangman Ridge, 105 Wn.2d at 791.

Moreover, the public transaction/private dispute dichotomy does not apply in every case. As our Supreme Court recognized almost 30 years ago:

This distinction between consumer and private disputes is very useful in the vast majority of Consumer Protection Act cases. Typically, these cases involve disputes between a purchaser of goods and a seller, or disputes between an individual paying for

- 20 -

services and the party rendering them. When this type of case appears, the procedure set forth in Hangman Ridge is an excellent vehicle for determining whether the public interest requirement is met.
　　However, in [some] case[s], it is clear that such a neat distinction between consumer and private disputes is not workable.

Nordstrom, Inc. v. Tampourlos, 107 Wn.2d 735, 741-42, 733 P.2d 208 (1987) (citations omitted). The public interest element may be satisfied in these cases all the same. See, e.g., Panag 166 Wn.2d 43-44; Stephens v. Omni Ins. Co., 138 Wn. App. 151, 177-78, 159 P.3d 10 (2007), aff'd, 166 Wn.2d 27, 204 P.3d 885 (2009).

This is one of those cases in which the "neat distinction" between consumer/contractual relationships drawn in Hangman Ridge does not apply. While Blackburn offers consumer services, it was Jablinske, not Rush, who solicited them. By responding to Jablinske's request, Blackburn, in effect, forced Rush into a consumer relationship with him. In order for Rush to recover the property wrongfully taken from him, Rush had no choice but to interact with Blackburn, whether to pay to redeem his vehicle or, at the very least, to request an impoundment hearing form. In this way, the relationship between Blackburn and Rush is more coercive than the standard consumer/contractual relationship contemplated by the Hangman Ridge framework. As a result, consumers in comparable situations are likely more vulnerable to abuse. Thus, construing the CPA broadly—as we are required to do, RCW 19.86.920—the structure of the towing and impoundment relationship provides a basis for asserting a public interest.

Moreover, our Supreme Court has articulated a basis to conceive of a public interest in the towing context. In <u>Crane Towing, Inc. v. Gorton</u>, 89 Wn.2d 161, 570 P.2d 428 (1977), the court addressed a challenge from, among others, the Washington Tow Truck Association regarding whether several sections of the prior towing and impoundment chapter were the product of a valid exercise of the police power.[13] The court determined:

> [W]e think a set of facts conceivably exists which support a finding that [the towing and impoundment chapter] tends to promote the safety and welfare of the people. Modern society's dependence on the automobile as the primary mode of travel is well known in this time of national discussion on energy conservation. Traveling hundreds of miles from one's home and back in 1 day, whether for business or pleasure, is surely not an uncommon experience. It cannot be doubted that the unexpected loss of the use of one's vehicle directly affects the safety and welfare of vehicle operators and owners. A person may be stranded hundreds of miles from home with no alternative mode of return travel and with no place to stay until the vehicle can be recovered. Similarly, the loss of the use of one's vehicle may substantially affect one's employment. Legislation which tends to assist members of the public from involuntarily losing the use of their vehicles and which tends to expedite recovery of their vehicles once they have been removed fairly and clearly promotes the safety and welfare of the public.[14]

---

[13] The statutes at issue in <u>Crane</u> were repealed in 1985. At the same time, a new chapter, addressing the same issues, was added to the relevant title. The new chapter was originally entitled "Abandoned, Unauthorized, and Junk Vehicles—Tow Truck Operators," but is now entitled "Towing and Impoundment." Laws of 1985, ch. 377 (currently in effect, as amended).

[14] Indeed, the fact that our Supreme Court approved of the statutes as a valid exercise of the police power is itself reflective of a potential public interest impact.

In measuring the constitutionality of a legislative enactment against the permissible bounds of the police power courts apply a two-step test.

> "First, does it tend to promote the health, peace, morals, education, good order and welfare of the people? More specifically, does it tend to correct some evil or promote some interest of the state?
>
> The second inquiry, more narrow, but equally important, is whether the particular statute under scrutiny bears a reasonable and substantial relation to accomplishing the purpose established in step one."

<u>Crane</u>, 89 Wn.2d at 168 (citations omitted) (quoting <u>State v. Conifer Enters., Inc.</u>, 82 Wn.2d 94, 96-97, 508 P.2d 149 (1973)).

Crane Towing, 89 Wn.2d at 169-70. Thus, our Supreme Court recognized the important personal and public interests at stake in the effective regulation of the towing industry.

As to the particular unfair or deceptive practice alleged herein, as further elaborated above, there is no dispute that Blackburn violated an applicable towing and impoundment regulation by auctioning Rush's vehicle before Rush's statutorily-guaranteed impoundment hearing was held. Moreover, undisputed evidence established that, in the course of his business, Blackburn "routinely" signed impound hearing request forms and that Blackburn had auctioned countless other impounded vehicles to himself, his daughter, his nephew and his sister in similar $1 sales. From this, there is a permissible inference that, in comparable circumstances, Blackburn might unlawfully auction another vehicle again.

This inference is further supported by Blackburn's arguments on appeal. Blackburn expresses incredulity at the suggestion that, despite the volume of paperwork he handles, he might be expected to follow up on each impound hearing request form. At the same time, Blackburn boldly denies that he received any communication from the district court regarding Rush's scheduled impound hearing. Moreover, he uses this alleged lack of notice as an excuse for unlawfully selling Rush's vehicle before the district court made its decision. By repeatedly asserting that he did nothing wrong in this case, Blackburn unwittingly supports an inference that he might repeat his unlawful conduct in the future.

We conclude that Rush adduced sufficient evidence to create an issue of material fact regarding whether Blackburn's conduct affected the public interest. Therefore, the trial court erred by granting summary judgment dismissal of Rush's CPA claim.

The trial court's order vacating the default judgment is affirmed. The order granting Blackburn's motion for partial summary judgment dismissal of Rush's CPA claim is reversed. The cause is remanded to the superior court for further proceedings.

_Dwyer, J._

We concur:

_Trickey, J_          _Cox, J._

2015 NOV -2 AM 10: 36