# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MICHAN RHODES, an individual; KEYSTONE WINDOWS AND DOORS, a Washington corporation,<br><br>    Appellants,<br><br>    v.<br><br>EMILY SHARP RAINS and MICHAEL RAINS, individually and their marital community; RAINS LAW GROUP, a professional limited liability company;<br><br>    Respondents,<br><br>HEATHER CHRISTIANSON and JOHN DOE CHRISTIANSON, and their marital community,<br><br>    Defendants.<br>--------------------------------------------<br>EMILY SHARP RAINS and MICHAEL RAINS, individually and their marital community,<br><br>    Third-Party Plaintiffs,<br><br>    v.<br><br>TONY DAVIS and AMERICAN CONTRACTORS INDEMNITY COMPANY, and RLI INSURANCE COMPANY,<br><br>    Third-Party Defendants. | No. 72801-6-I<br>(consolidated with 72802-4-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: May 31, 2016 |

BECKER, J. — The owner of a now defunct small business appeals the order dismissing her Consumer Protection Act claim on summary judgment. There is evidence that the defendant used deceptive advertising in a scheme to gain the owner's confidence and exploited the struggling business for personal gain. The defendant's status as a company employee does not shield her from liability. Because there are genuine issues of material fact with respect to all five elements of a consumer protection claim, we reverse and remand for trial of that claim.

Summary judgment is reviewed de novo. Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc., 162 Wn.2d 59, 69, 170 P.3d 10 (2007). "We consider all facts in the light most favorable to the nonmoving party and affirm a grant of summary judgment only if we determine, based on all of the evidence, reasonable persons could reach but one conclusion." Indoor Billboard, 162 Wn.2d at 70. The moving party has the burden of showing that there is no genuine issue as to any material fact. Indoor Billboard, 162 Wn.2d at 70.

We state the facts in the record in the light most favorable to plaintiffs Michan Rhodes and her company, Keystone Windows and Doors Inc. According to Rhodes, she founded Keystone and built it up over a period of nine years, working out of her home and eventually opening a showroom in Seattle. She was the only shareholder and board member. Keystone prospered in terms of its ability to produce sales. The company was more or less current in accounts until a longtime full-service accountant and controller resigned in 2010. By June 2011, a permanent replacement in that position had not been found, and Rhodes

realized that Keystone was on the verge of bankruptcy due to neglect of financial management and accounting. Looking for assistance in that area, Rhodes was referred to defendant Emily Rains. Rhodes met with Rains on June 20, 2011, in a restaurant in the Fremont area of Seattle. Thus began a relationship that continued for the next 15 months.

Rains identified herself as the owner of the Rains Strategic Accounting Firm. She represented that she had 1,500 clients and had frequently assisted individuals and entities similar to Rhodes and Keystone. She explained that because she was also a lawyer, she could assist with legal matters as well. Rains asked for an initial retainer of $15,000.

After this initial meeting, Rhodes researched Rains Strategic Accounting on the internet. The firm was described in a "Company Profile" as "the nation's leader in comprehensive and integrated accounting solutions." The profile stated that the company employed bookkeepers, accountants, reporting analysts, certified public accountants, tax attorneys, and a network of respected chief financial officers to provide comprehensive support to business operators at affordable prices. Rhodes was impressed with Rains. The promotional material on the internet helped to convince Rhodes that Rains would generate "reliable financial data that I could trust."

Rhodes sent a check for $15,000 to Rains and signed a retainer and fee agreement. The agreement stated that Rhodes was contracting with the "Rains Law Group" for services related to corporate liquidation, dissolution, Washington state tax analysis, and bankruptcy support. It stated that the services would be

3

provided by Emily Sharp Rains, "Senior Attorney." Hourly rates were listed as $275 for an associate attorney, $415 for a senior attorney, and $125 for a legal clerk.

Rains began to work with Rhodes and to review Keystone's financial information. Together, Rains and Rhodes met with a bankruptcy attorney. At this time, the end of June 2011, Keystone had virtually no operating funds due to a withdrawal of more than $65,000 by the Department of Revenue for back taxes. Rains discussed with Rhodes the options of bankruptcy and sale of the business. Upon learning that Rhodes had personal savings of $65,000, Rains advised her to contribute those funds and continue to operate the company with the goal of rebuilding it.

On July 7, 2011, Rains accompanied Rhodes to the bank where Rhodes deposited her personal savings into the Keystone business account. Rains insisted that she and her husband, Michael Rains, be added as signers on the account. Rhodes agreed to put Rains on the account because she assumed that it was important for her attorney to have signing authority, but she refused to add Michael Rains.

Also in early July 2011, Rains suggested that she continue working for Keystone "to organize the accounting and any legal issues Keystone had." Rains became an employee of Keystone. With Rhodes' approval, Rains assumed the titles of Chief Financial Officer and General Counsel for Keystone. She drew $2,500 every two weeks, approximately the same amount that Rhodes was drawing.

4

Rains took on the day-to-day bookkeeping operations of the company and hired her sister, Heather Christensen, to perform bookkeeping as an independent contractor. Rains also arranged for Keystone to hire her husband, Michael Rains, to handle information technology. Michael Rains obtained control of the accounting system. Thereafter, Rhodes was unable to gain access to accounting information without going through him. Over a six-month period beginning in September 2011, Michael Rains billed Keystone $49,338 on behalf of "Rains and Rains Consulting." In June 2012, Rains raised her own salary from $2,500 to $10,000 per month. She increased Rhodes' draw as well. Rains assured Rhodes that the company was doing well and could afford it.

Focused on making sales, Rhodes noticed as time went on that Rains was not producing financial reports. Rhodes became increasingly frustrated with the lack of information that would allow her to gauge how the company was doing financially.

In September 2012, Rhodes informed Rains "that I wasn't getting any reports from her so I could understand the finances of the company, and I was bringing somebody in to look at my books. It was at that time . . . Rains was scrambling to prepare for her exit." Rains resigned abruptly on October 17, 2012, leaving behind what Rhodes describes as "an accounting nightmare" of unpaid vendors, unpaid bills, unpaid taxes, unrenewed insurance policies, and an unanswered writ of garnishment. Rhodes found documents Rains had prepared and filed identifying herself as a part owner of Keystone. Rhodes also learned

5

that Rains had failed to pay an outstanding balance of almost $30,000 for windows Rains had ordered for her own house.

Rhodes hired a different accounting firm in November 2012. She spent approximately $10,000 over the next several months to get the bookkeeping cleaned up. Rhodes closed Keystone in April 2013. She believes she could have saved the company if Rains had not left it in such bad shape financially. Rhodes states that she would have stopped taking draws herself, would have terminated Rains earlier, and would have hired cheaper accounting help if Rains had not concealed the company's poor financial condition.

This litigation began in December 2012. Rhodes and Keystone sued Rains for legal malpractice, breach of fiduciary duty, and consumer protection violations. Rains counterclaimed for nonpayment of wages. The trial court dismissed the malpractice and consumer protection claims on summary judgment. A jury found against Rains on the remaining claim for breach of fiduciary duty. The jury awarded $7,685.29 for Rains' conduct when she was acting as an outside attorney and $88,764.38 for her conduct when she was employed in-house as an officer of Keystone. The jury found for Rains on the wage claim and awarded her $18,780.08 for willfully withheld wages. After adding interest and attorney fees, doubling the wage claim damages, and calculating the offset, the trial court entered a net judgment for Rhodes and Keystone in the amount of $40,162.89.

Rhodes and Keystone appeal the summary judgment dismissing their consumer protection claim.

To prevail on a claim under the Consumer Protection Act, chapter RCW 19.86, a private plaintiff must prove (1) an unfair or deceptive act or practice (2) occurring in trade or commerce (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986). Rains contends Rhodes failed to establish all five elements.

### UNFAIR OR DECEPTIVE ACT OR PRACTICE

Rhodes contends the first element is satisfied by evidence showing that Rains made false promises regarding "expert financial management services" and that she had a scheme to exploit vulnerable small businesses for personal gain. Rhodes also alleges that Rains engaged in deceptive billing for legal services.

Although the Consumer Protection Act does not define the term "deceptive," an act or practice is deceptive if it has the capacity to deceive a substantial portion of the public. Panag v. Farmers Ins. Co. of Wash., 166 Wn.2d 27, 47, 204 P.3d 885 (2009). The purpose of the capacity-to-deceive test is to deter deceptive conduct before it occurs. Dwyer v. J.I. Kislak Mortg. Corp., 103 Wn. App. 542, 547, 13 P.3d 240 (2000), review denied, 143 Wn.2d 1024 (2001). Neither intent to deceive nor actual deception is required. Dwyer, 103 Wn. App. at 547.

False promises and advertising

Contrary to Rains' argument, Rhodes' allegations of false promises and false advertising are neither vague nor innocuous. In her online company profile

as well as her verbal pitch to Rhodes, Rains portrayed herself as leading a successful firm with many skilled professional employees. The record contains no evidence of anyone who worked for Rains except for her husband, who had no accounting background, her sister, whose background was in cosmetology, and a bookkeeper hired later. Rhodes once suggested a meeting with Rains at her purported law office in Fremont, but Rains declined because there was "sensitive material" there. In fact, the address was "nothing but a place with mail boxes." A jury could find that Rains committed an unfair or deceptive act by misrepresenting the nature of her business and the experience and expertise of the personnel associated with it in a way that had the capacity to deceive.

Confidence scheme

Rhodes presented evidence that Rains schemed to put herself in a position where she could covertly siphon off Keystone's revenues to benefit herself and her family members. Rains used her status as an attorney along with the false advertising to win Rhodes' trust. Having obtained a trusted position as an officer of the company, Rains lulled Rhodes into a false belief that the company's financial obligations were current, and she concealed information that showed otherwise. Rains hired Grace Alonzo to help with bookkeeping. According to Alonzo, Rhodes begged her for financial reports and at one point asked for Alonzo's help in figuring out how to use a new database created to track sales. Alonzo could see that Rhodes was "feeling desperate for answers and frustrated," but Rains had instructed Alonzo "not to discuss financial matters" with Rhodes and not to take directions from her.

Rains argues that once she became a Keystone employee, her conduct was no longer actionable under the Consumer Protection Act and Keystone's only remedy was to fire her for poor performance. For this proposition, Rains cites RCW 19.86.070, which states that the "labor of a human being is not a commodity or article of commerce." RCW 19.86.070 has been referred to as "the labor exemption." Ernst Home Center, Inc. v. United Food & Commercial Workers Int'l Union, AFL-CIO, Local 1001, 77 Wn. App. 33, 46-47, 888 P.2d 1196 (1995). Derived from federal antitrust laws, the exemption of labor organizations from liability reflects an accommodation between congressional policies favoring free competition in the marketplace and labor policies favoring collective bargaining and other union activities. The federal exemption "may only be asserted by a labor organization acting in its self-interest." Ernst Home Center, Inc., 77 Wn. App. at 47.

Rains does not explain how RCW 19.86.070 prevents an employer like Rhodes from suing an employee in a case not involving union activity. Rhodes is not alleging that Rains violated the Consumer Protection Act by performing below expectations as an employee. Rhodes is alleging that Rains utilized deception and concealment in a scheme to obtain a position with Keystone as a trusted employee so that she could drain the company's income to herself. A jury could find that such a scheme is an unfair and deceptive practice.

Padded bill for legal services

Rhodes claims that Rains was deceptive in the way she billed for legal services. The claim is based on a single billing invoice. Rhodes sent Rains a

9

retainer of $15,000 for legal services in late June 2011 before there was any discussion of Rains being a Keystone employee. Rains never gave Rhodes an invoice or accounting for the $15,000 retainer. After this litigation began, Rhodes received a one-page Rains Law Group invoice in response to a request for production. Rhodes had never seen it before. The invoice contains 20 entries for the period from June 22 through July 5, 2011, for the meeting with the bankruptcy attorney, phone calls, discussions with Rhodes and others, and review of various documents. The invoice shows total fees incurred of $15,209.75, with a balance of $209.75 owing after exhaustion of the retainer. All work is charged at $415.00 per hour, the rate stated in the retainer agreement for a "Senior Attorney."

The two largest items are for a five-hour conference call with Rhodes on June 30 and an on-site visit with Rhodes for 9.25 hours on July 1. Rhodes claims these two entries in particular are "bogus."

Lawyers may be subject to consumer protection liability if the suit seeks to recover for acts that relate to "entrepreneurial aspects of the practice of law" and does not purely allege negligence or legal malpractice. Short v. Demopolis, 103 Wn.2d 52, 60, 691 P.2d 163 (1984). The issue about the allegedly padded bill is not one of negligence or legal malpractice.

Rains contends that Rhodes cannot complain about being charged $415 per hour because she signed the retainer agreement, which clearly stated $415 as the rate for a "Senior Attorney." But there is a question whether the retainer agreement may have misled Rhodes into thinking that part of the work would be

assigned to an "Associate Attorney" at $275 per hour. And Rhodes is primarily asserting exaggeration of hours worked, not inflation of the hourly rate.

The entrepreneurial aspects of the practice of law are those related to "how the price of legal services is determined, billed, and collected and the way a law firm obtains, retains, and dismisses clients." Short, 103 Wn.2d at 61. We are mindful of Rains' argument that a simple dispute between attorney and client about the number of hours worked on a particular date should not be elevated to the status of a consumer protection claim. But here the evidence is not only that Rains padded the bill. There is an inference that she did not even prepare the bill until called upon to produce it in litigation more than a year after performance of the services itemized. A jury could conclude that Rains fabricated the allegedly bogus entries after the fact to justify keeping the entire $15,000. Under these circumstances, the allegation of unfair and deceptive billing is actionable under Short.

### TRADE OR COMMERCE

Under the Consumer Protection Act, trade and commerce "shall include the sale of assets or services, and any commerce directly or indirectly affecting the people of the State of Washington." RCW 19.86.010(2). These terms are to be construed broadly. Hangman Ridge, 105 Wn.2d at 785.

Rains contends the Consumer Protection Act does not apply because an employer is not a consumer and an employee is not a commodity. As discussed above, Rains' status as a Keystone employee does not protect her when she allegedly used deception to attain and hold her status as a trusted employee. A

private action may be brought by one who is not in a consumer relationship with the actor against whom the suit is brought. It is the five Hangman Ridge elements that assure that the plaintiff is a proper party to bring suit. Panag, 166 Wn.2d at 43-44.

Rains deceived Rhodes over the course of their business relationship. A jury could find that the unfair and deceptive acts and practices alleged by Rhodes occurred in trade or commerce.

PUBLIC INTEREST ELEMENT

A plaintiff may establish that an alleged unfair or deceptive act or practice is injurious to the public interest because it:

> (1) Violates a statute that incorporates this chapter;
> (2) Violates a statute that contains a specific legislative declaration of public interest impact; or
> (3)(a) Injured other persons; (b) had the capacity to injure other persons, or (c) has the capacity to injure other persons.

RCW 19.86.093; Rush v. Blackburn, 190 Wn. App. 945, 967-68, 361 P.3d 217 (2015). Rhodes does not allege that Rains' conduct violated a statute. She satisfies the public interest element under subsection (3), which bases public interest impact on actual injury and capacity to injure. Rush, 190 Wn. App. at 968.

It is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes a factual pattern from a private dispute to one that affects the public interest. Hangman Ridge, 105 Wn.2d at 790. In the context of a private dispute such as the provision of professional services, factors indicating public interest include:

12

(1) Were the alleged acts committed in the course of the defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions?

Hangman Ridge, 105 Wn.2d at 790-91. No one factor is dispositive, nor is it necessary that all be present. Hangman Ridge, 105 Wn.2d at 790-91.

Rains committed deceptive acts in the course of operating her businesses. Her advertising marketed the Rains Strategic Accounting Firm to "small and mid-market businesses" whose operators "did not possess the requisite knowledge necessary to hire and hold accountable qualified accounting professionals." Rains herself recognized that her targeted client base was an unsophisticated and vulnerable group. Her company profile offered to help "business operators without financial backgrounds" who found they had hired "inexperienced individuals who are self proclaimed experts but are little more than data processors." This advertising was on the internet, directed at the public in general. Rains actively solicited Rhodes when they met in person as a client for the Rains Law Group as well as for Rains Strategic Accounting.

The potential for Rains soliciting others is reinforced by the declaration of Kyle Duce, a small business operator who had a similar experience with Rains. Duce states that he was referred to Rains for financial management advice in October 2010 when he was planning to open a restaurant. He was inspired to trust Rains by her claims that she "had a big accounting office in Fremont" and that she was an expert tax attorney "who had helped hundreds of start-up businesses." During the few months that Rains worked with Duce, "she did not

13

file a single tax return on time," costing the company substantial amounts in interest and penalties. Duce said that Rains "wanted to be an operating owner and asked to make business decisions"; she got her husband Michael involved in doing the accounting; she invoiced Duce for $20,000 for services, an amount that "flabbergasted" Duce, who had never received an estimate; she asked for a 12 percent ownership interest as payment of the invoice; and she prepared tax documents that falsely listed her as a co-owner of the business. The similarities indicate that Rains' deception of Rhodes was part of a predatory pattern, not a one-time aberration.

Rains contends that Keystone, as an employer, necessarily had the advantage in their respective bargaining positions. But this was not an ordinary employment relationship. Rains started out with the advantage of being an attorney, and after going in-house, she used concealment and deception and manipulation to undermine the strength of Keystone's position as employer.

A jury could find that Rains' deceptive acts and practices have the potential for repetition and are injurious to the public interest.

CAUSATION AND INJURY

A plaintiff satisfies the Consumer Protection Act's causation requirement by demonstrating that there is a causal link between the misrepresentation and the plaintiff's injury. "A plaintiff must establish that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury." Indoor Billboard, 162 Wn.2d at 84. The injury requirement may be satisfied even if the

expenses caused by a consumer protection violation are minimal. Panag, 166 Wn.2d at 57.

Rains argues that Rhodes alone caused the destruction of Keystone through her own shortcomings as a business person. The evidence, however, supports a finding that the conduct of Rains was at least a proximate cause, if not the only one.

Rains argues that injury cannot be established as to her acts when she was in the employ of Keystone because having to pay a salary is not an injury. This argument is not persuasive. Rains' status as an employee is not a bar to suit.

The injuries here are more than minimal. Rhodes presents evidence that Rains' deceptions induced her to pay out exorbitant sums that otherwise could have been used to pay the company's debts. But for Rains' scheming and her concealment of important financial information, Rhodes arguably would have terminated Rains earlier and saved the money paid to Rains for services she did not perform. If Rains had presented the $15,000 invoice at the time she performed the legal services itemized therein, Rhodes could have disputed it and avoided paying the bogus charges.

The evidence of injury and causation is sufficient to take the issue to trial.

In summary, Rhodes has presented evidence creating a genuine issue of material fact with respect to the five elements of a Consumer Protection Act claim.

MICHAEL RAINS

The order granting partial summary judgment to the defendants states, with respect to the Consumer Protection Act claims, three separate dismissals as follows:

> 4. All claims for violation of the Consumer Protection Act asserted by Plaintiffs against Rains Law Group are dismissed with prejudice;
> 5. All claims for violation of the Consumer Protection Act asserted by Plaintiffs against Michael Rains, personally, are dismissed with prejudice; and
> 6. All claims for violation of the Consumer Protection Act asserted by Plaintiffs against Emily Rains, personally, are dismissed with prejudice.

Rains contends that the dismissal of Michael Rains, personally, should be affirmed because there is no evidence or argument supporting a consumer protection claim against him personally. Rhodes responds that Michael Rains participated in the overbilling and should be held liable as an agent of the Rains entities and as an agent of the marital community. It is not clear from the record that the trial court would have dismissed Michael Rains personally if the court had allowed the consumer protection claim to go forward against Emily Rains personally and as Rains Law Group. For this reason, we reverse all three dismissals and reinstate the consumer protection claim against all three named defendants.

## ATTORNEY FEES

Rhodes seeks an award of attorney fees for this appeal under RCW 19.86.090. That request is premature. Rhodes may seek an award of fees and costs for this appeal from the trial court if she prevails on remand.

The order dismissing the Consumer Protection Act claim against Emily Rains, Michael Rains, and the Rains Law Group is reversed.

Becker, J.

WE CONCUR:

Trickey, ACJ

Schindler, J

17