[Cite as *Powell v. Airstream, Inc.*, 2019-Ohio-3034.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

DAVID POWELL,

    PLAINTIFF-APPELLANT,

    v.

AIRSTREAM, INC.,

    DEFENDANT-APPELLEE.

CASE NO. 17-18-17

O P I N I O N

---

**Appeal from Shelby County Common Pleas Court**
**Trial Court No. 17CV000145**

**Judgment Affirmed**

**Date of Decision:  July 29, 2019**

---

**APPEARANCES:**

    *Elizabeth Ahern Wells* **for Appellant**

    *James L. Thieman and Cameron C. Downer* **for Appellee**

**WILLAMOWSKI, J.**

{¶1} Plaintiff-appellant David Powell ("Powell") brings this appeal from the judgment of the Court of Common Pleas of Shelby County granting summary judgment to defendant-appellee Airstream, Inc. ("Airstream"). For the reasons set forth below, the judgment is affirmed.

{¶2} On June 12, 2016, Powell purchased a new 2016 Airstream Flying Cloud RV ("the RV") that was built and warranted by Airstream in Jackson Center, Ohio. Doc. 1. Powell purchased the RV from Airstream Adventures ("AA") in Covington, Washington. *Id.* Soon after the purchase, the RV allegedly began to have several issues and spent a significant amount of time being repaired. *Id.* Powell lost confidence in the vehicle and filed a complaint with a jury demand in Shelby County, Ohio on July 19, 2017. *Id.* In the complaint, Powell alleged that Airstream had breached the express warranties, breached the contract, violated the Magnuson-Moss Warranty Act, and violated the Washington Consumer Protection Act ("WCPA"). *Id.* On August 24, 2017, Airstream filed its answer denying the alleged violations and raising several defenses including lack of privity of contract, limitation of damages, and failure of conditions precedent. Doc. 7.

{¶3} On April 19, 2018, Airstream filed a motion for summary judgment. Doc. 23. Airstream claimed that without privity of contract, the implied warranty and breach of contract claims must fail. *Id.* Airstream further asserted that the breach of the express warranties and violations of the Magnuson-Moss act must also

fail because Airstream complied with the warranties by complying with the Repair Remedy. *Id.* Airstream also alleges that Powell failed to exhaust his remedies by not complying with the "Back-Up Remedy". *Id.* Finally, Airstream claimed that the WCPA claim fails because there was no underlying statutory violation or a public interest to support the claim. *Id.* Powell filed his memorandum in opposition to the motion on May 23, 2018. Doc. 37. Airstream then filed its reply to the memorandum on June 19, 2018. Doc. 45. On October 1, 2018, the trial court granted Airstream's motion for summary judgment. Doc. 95. Powell filed a timely notice of appeal from this judgment. Doc. 101. On appeal, Powell raises one assignment of error.

> **The trial court erred when it granted Airstream's motion for summary judgment on all claims.**

{¶4} The sole assignment of error in this case raises the question as to whether the lower court erred in granting summary judgment.

> **An appellate court reviews a trial court's summary judgment decision de novo, independently and without deference to the trial court's decision.** *Ohio Govt. Risk Mgt. Plan v. Harrison*, **115 Ohio St.3d 241, 2007-Ohio-4948, 874 N.E.2d 1155, at ¶ 5, citing** *Comer v. Risko*, **106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, at ¶ 8. Summary judgment is appropriate only "when the requirements of Civ.R. 56(C) are met."** *Adkins v. Chief Supermarket*, **3d Dist. No. 11-06-07, 2007-Ohio-772, at ¶ 7. The party moving for summary judgment must establish: (1) that there are no genuine issues of material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor.**

**Id., citing Civ.R. 56(C);** *Horton v. Harwick Chem. Corp.* **(1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, at paragraph three of the syllabus. In ruling on a motion for summary judgment, a court may not "weigh evidence or choose among reasonable inferences * * *."** *Id.,* **at ¶ 8, 653 N.E.2d 1196, citing** *Jacobs v. Racevskis* **(1995), 105 Ohio App.3d 1, 7, 663 N.E.2d 653. Rather, the court must consider the above standard while construing all evidence in favor of the non-movant.** *Jacobs***, at 7, 663 N.E.2d 653.**

**The party moving for summary judgment must identify the basis of the motion to allow the non-movant a "meaningful opportunity to respond."** *Mitseff v. Wheeler* **(1988), 38 Ohio St.3d 112, 116, 526 N.E.2d 798. In its motion, the moving party "must state specifically which areas of the opponent's claim raise no genuine issue of material fact and such assertion may be supported by affidavits or otherwise as allowed by Civ.R. 56(C)."** *Id.* **at 115, 526 N.E.2d 798, citing** *Harless v. Willis Day Warehousing Co.* **(1978), 54 Ohio St.2d 64, 66, 375 N.E.2d 46, citing** *Hamlin v. McAlpin Co***. (1964), 175 Ohio St. 517, 519-520, 196 N.E.2d 781;** *Dresher v. Burt* **(1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. If the moving party fails to meet its burden, summary judgment is inappropriate; however, if the moving party meets its initial burden, the non-moving party has a "reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial * * *."** *Dresher,* **at 294, 662 N.E.2d 264.**

*Lillie v. Meachem*, 3d Dist. Allen No. 1-09-09, 2009-Ohio-4934, ¶21-22. This court notes that the parties agree that Washington law applies to the substantive arguments. As the standard of review is de novo, we will review whether reasonable minds could reasonably reach a verdict in favor of Powell based upon the claims set forth in the complaint.

{¶5} A review of the repair records for this RV provided as exhibits for Powell's memorandum contra the motion for summary judgment show the following history of repairs. See Doc. 27, Ex. 8, 10, and 11. Prior to the delivery

of the vehicle, AA conducted a pre-delivery inspection report and repaired or noted issues found. *See also* Lamb Dep. at 32. The inspection noted eight issues: 1) rock dings on the rock guard, 2) a rivet missing about the entry door, 3) chips in bedroom closet door, 4) gaps in the sealant in various locations, 5) a scratch in the wall by the bathroom door, 6) a scratch on the range cover, 7) a noisy bathroom fan, and 8) a small divot in the linoleum at the entrance. The records produced by Powell indicate that new rock guards were ordered, the missing rivet was replaced, the chips in the bedroom door were repaired, the areas missing sealant were resealed, the scratch on the range cover was removed and repolished, and the bathroom fan was adjusted to run properly. The scratch on the wall and the divot in the linoleum had no noted repairs.[1] Powell was notified on June 20, 2016, that the vehicle was ready for pickup.

{¶6} On July 21, 2016, Powell's son Dan and sister-in-law Teresa (collectively known as "the customers"), who were the ones using the RV, took the vehicle to George Sutton RV ("Sutton") claiming six alleged issues: 1) the Velcro was pulling off the seat cushions, 2) the dinette table was not releasing from the brackets, 3) the Sothco had pulled out of the cabinet door below the stove, 4) the shower leaked at the bottom of the door when used, 5) the USB port was pushed in at the bedroom cabinet, and 6) the rear awning arm was hard to retract. Sutton

---

[1] Although there was no noted repair to the linoleum, the warranty claim to Airstream showed that AA billed them for labor in regard to the linoleum. Doc. 37, Ex. 11.

aligned the tabs on the dinette table so that it worked properly, replaced a stripped screw on the cabinet door to resolve the second and third issue. The shower was repaired by replacing the wipe seal. Upon testing, there was no more leak. Nothing was done about the cushion, the USB ports, or the awning at that time and the RV was returned to Dan and Teresa that same day. On July 27, 2016, the customers returned to AA to have these issues resolved. AA replaced the USB port and adjusted the awning arm to function smoothly. AA also requested approval from Airstream to replace the cushions. The vehicle remained with AA for two days.

{¶7} On August 29, 2016, the customers brought the RV back to AA with three new complaints: 1) water was pooling in the corner of the shower cabinet when attached to city water; 2) the shower door was leaking again, and 3) a drawer in the bedroom opened in transit. The customers also requested that a multi-point inspection ("MPI") be completed and requested a status check on the replacement of the cushions. The water in the shower cabinet was caused by a loose fitting at the water pump, which went away when tightened. The shower door was leaking because the frame and threshold were not square. AA sought to fix this issue by ordering replacements. The drawer issue was resolved by replacing the 5 lb. latch with a heavy duty 10 lb. latch. The status check on the cushions showed that replacements had been approved and ordered. The MPI showed that 1) a 30 amp

inlet LED light[2] was not working, 2) the bathroom fan was rattling, 3) the shower fan was hitting the housing, 4) the deadbolt was loose in the door, 5) the screen door gasket was torn in the corner, 6) the screen door latch was hitting the frame, and 7) a rivet head had popped off by the entry door during transit. AA resolved these issues by replacing the bad outlet, moving wires to resolve the noisy bathroom fan, replacing a missing screw in the shower fan allowing it to function as designed, tightening the screws in the deadbolt to allow it function as designed, removing the torn gasket on the screen door and replacing it with a new one, realigning the screen door to allow it to function properly, and drilling out the old rivet to replace it with a new one. The time out for these repairs is not clear from the record, but part of the time also included the installation of a satellite dish per the request of the customers.

{¶8} On October 3, 2016, the customers returned the RV to AA to allow AA to install the new shower assembly and to replace the covers on the cushions. An MPI was completed at that time as well, which showed that the bolt nuts on the rock guard were stripped. AA remedied this problem by replacing the bracket and riveting it into place. The customers also complained that the bedroom drawer would still open during transit and that the toilet was leaking at its base. AA's inspection showed that the drawer was functioning as designed. AA could not

---

[2] This is a small light on the outlet showing that it is receiving power. The light not working may indicate the outlet was not working or that the light itself was bad.

reproduce the leak at the base of the toilet and saw no issues, so no repair was attempted at that time. The RV was undergoing repairs for seven days this time.

{¶9} On November 18, 2016, a tree branch came down on the RV causing damage to it. The customers took the RV to AA on December 3, 2016, to have an estimate done for the cost of repairs and presented a lengthy list of issues with the RV that they believed to be covered by the warranty. This list included the following issues: 1) the deadbolt was loose, 2) USB port had no power, 3) ceiling covers falling off, 4) hinge on wardrobe door pops off, 5) toilet won't hold water, 6) no warm air in front vents, 7) beds not level, 8) 30 amp outlet LED lights not working, 9) burners on stove will not light, 10) cabinet door by DVD player was hard to open, 11) refrigerator seal falling off, 12) a rivet was pulled down in the bathroom ceiling, 13) the entry door was leaking on the interior side of the door, 14) the fantastic fan[3] was not working, and 15) the entry door was hard to open and close. Over six days, AA repaired the problems by 1) tightening the screws in the deadbolt and verifying it was functioning; 2) replacing the bad USB port; 3) replacing all the vent covers with new ones and verifying that they snapped into place tightly; 4) resetting the hinges on the wardrobe door and screwing them into place; 5) removing and replacing the bowl seal on the toilet; 6) installing additional supports to the bed frame to level the mattresses; 7) replacing the 30 amp outlet

---

[3] The fantastic fan appears to be the vent fan over the stove.

lights on both receptacles and testing to make sure they were functioning; 8) replacing the left rear wire to the stove burners and testing to insure they were functioning properly; 9) resetting the screws in the cabinet door to allow it to open and close correctly; 10) realigning the refrigerator seal and refastening it into the proper place; 11) drilling out the damaged rivet and installing a new one; 12) cleaning and resealing around the entry handle where it was leaking; 13) securing the ground switch to the fantastic fan to allow it to function properly; and 14) shimming the door frame catch out with a washer to allow it to function correctly. AA was not able to resolve the furnace problem because the same air flow was coming out of the front and rear vents, so the problem could not be replicated. Additionally, during the time the RV was there, AA performed an MPI, winterized the vehicle and installed a customer supplied vent fan in the bathroom as well as completing the insurance estimate.

{¶10} On December 13, 2016, the customers returned the RV to AA due to water pooling in the shower and a drawer opening in the bedroom during transit. The water issue was found to be caused by a loose fitting behind the wall. The fitting was tightened and no leaks were found when tested under pressure. The 5 lb. drawer catch was replaced with a 10 lb. drawer catch to remedy the problem. At that same time, another MPI was conducted and revealed more issues: 1) a 30 amp inlet light was not working; 2)the bathroom fan was rattling when it hit wires; 3) the deadbolt needed tightened; 4) the screen door gasket was torn and the door was not

closing correctly; and 5) a rivet head had popped off in transit. The inlet light was removed and replaced, the wires in the fan were moved out of the way and secured to not interfere with the function of the fan, the deadbolt was tightened, the damaged seal on the screen door was removed and a new one installed, the screen door was realigned, and the old rivet was removed and a new one was installed. This was completed on that same date.

{¶11} On January 5, 2017, the customers brought in the RV for repairs due to the damage from the tree branch. In addition to those repairs, the customers informed AA that 1) water was coming in the dinette window, 2) air was coming in the bedroom window and there was a water stain on the curtain, 3) the left rear burner on the stove would not light, 4) the grey and black valves were sticking, 5) a blind clip had cracked, and 6) weather stripping was coming off the entry door. The first two issues were resolved by tightening the latch to provide a better seal and checking the sealants. AA noted that there was a condensation issue in the trailer due to improper venting. AA fixed the stove by tightening the burner springs for better contact. Valve lube was added to the sticking valves. The damaged blind was removed and replaced with a new one. The weather stripping coming off the entry door was removed and replaced with new. Although the repair records do not indicate how long these repairs, as well as the accident damage, took, Powell claims that the RV was returned to them on January 12 for seven days.

{¶12} On January 19, 2017, a repair order was created indicating that the shower fan and the fantastic fan were inoperable. AA replaced the motor in the shower fan allowing it to work correctly. The fantastic fan was not inoperable, but the issue was the result of user error, so proper use was explained to the customers. This took one day.

{¶13} On January 26, 2017, the RV was brought in to AA due to a claim that the toilet was leaking at the base. AA replaced the valve and no leak was found at that time. The RV was returned that same day. Later, AA received a call from the customers indicating that it was leaking again. AA sent a technician to the customers' location. The technician then replaced the toilet. On February 10, 2017, AA was notified that the furnace was inoperable. When checked by AA, the furnace seemed to be working properly. The outside temperature was 47, but the inside temperature was 75. This also took one day.

{¶14} On February 15, 2017, the customers brought in the RV and claimed that 1) the furnace was not putting out hot air, 2) the toilet was not getting water, and 3) the toilet was leaking. They also requested that an MPI be performed. The MPI showed that the RV was in good working order. The furnace was fixed by the installation of a new ignitor board and sail switch. The toilet began to receive water once the valve was properly seated. The toilet was not the source of the water leak, but AA found the leak was coming from a fitting on the inlet side of the water heater.

AA fixed this problem by installing a new cone washer. All of this was done in one day.

{¶15} On April 28, 2017, the customers brought in the RV claiming that 1) the 30 amp LED light was not working, 2) a light switch was pushed in, 3) the bathroom fan was rubbing on the housing, 4) the refrigerator light was inoperable, 5) there was a squeak in the floor between the beds at the rear of the RV, 6) the water heater was leaking again, and 7) the black tank would not zero out when dumped. The plugs with the 30 amp LED lights were removed and replaced. The light switch and the housing was removed and replaced. The bathroom fan was removed and a new fan was installed with new set screws to allow it to function properly. The refrigerator light was working properly, the bulb just needed replaced. The squeak in the floor was noted, but no issue was found. The leak at the water heater was a drip at the city fill inlet, which was replaced. The sensor in the black tank needed cleaning. This was all completed within a day or two.

{¶16} On June 7, 2017, the customers brought in the RV and requested and MPI be completed. The Customers alleged the following complaints: 1) the mattress was moldy, 2) the floor squeaked, 3) the toilet was not getting or retaining water, 4) the bedroom window was hard to open, 5) the window in the dining area would not pull in all the way, 6) the air conditioning was not cold enough, 7) the license plate light was loose, 8) the kitchen floor area was soft, 9) the latch cap had come off the cabinet door under the bed, 10) the molding trim was loose in the

bedroom, 11) the entry door latch was hard to open, and 12) the furnace was inoperable. The mattress was replaced by Airstream at no cost. The squeaky floor and the alleged soft area in the floor of the kitchen were checked, but no problem was found. The toilet was replaced and tested to insure the new one was working. A check of the bedroom window showed the brackets were too low, so they were moved up ¼ inch and then worked correctly. The window in the dining room had a broken latch, so the latches on all the windows in the dining area were replaced so they would match. The air conditioning system was checked and found to be working as designed. The connections on the license plate light were tightened. A new latch cap was installed on the cabinet door. The molding trim was glued to the wall and new seam trim was installed. The door latch was corrected by lubing the lock and latch assembly. The furnace could not be repaired at that time because the issue was a bad board and a replacement had to be ordered. The repair records of AA show that the repairs, except for the furnace, were completed in one day.

{¶17} On August 2, 2017, the customers brought the RV back to AA to complete the repair on the furnace and the toilet, which was not filling with water. On that day, the bad board on the furnace was replaced and the air gap on the ignitor was adjusted to allow the furnace to function correctly. The toilet was repaired. AA's records show that the customers were notified it was ready after one day, however the customers did not pick up the RV until October.

*Breach of Warranties*

{¶18} The first claim in the complaint alleges that Airstream breached the manufacturer's warranties. Powell claims that Airstream violated not only the express warranties, but the implied warranties as well.

*Implied Warranties*

{¶19} Powell argues that the RV breached the implied warranties of merchantability. Article 2 of the UCC, as adopted in Washington, provides an implied warranty of merchantability that assures that goods sold are fit for the ordinary purposes for which such goods are used as long as the seller is a merchant of goods of that kind and the warranty is not specifically excluded by contract. RCW 62A.2-314. However, a "lack of privity has historically been a defense to claims of breach of warranty." *Tex Enterprises, Inc. v. Brockway Standard, Inc*. 149 Wash.2d 204, 209, 66 P.3d 625 (2003).

> **There are two types of plaintiffs for whom lack of privity has been a concern. A " 'horizontal' non-privity plaintiff" is not a buyer of the product in question, but is one who consumes or is affected by the goods. \* \* \* The " 'vertical' non-privity plaintiff" is a buyer who is in the distributive chain, but who did not buy the product directly from the defendant.**

*Id*. (citations omitted). Although the Washington Legislature chose to eliminate the privity requirement for horizontal non-privity plaintiffs under certain circumstances, it was silent in regard to vertical privity. *Id*. The Supreme Court of Washington held that absent privity or an underlying contract to which the remote

purchaser is a third-party beneficiary, there can be no recovery for a vertical non-privity plaintiff based upon breach of an implied warranty. *Id*. at 214.

{¶20} In this case, Powell purchased the RV from AA. The Vehicle Purchase Order identified the seller as AA. Doc. 37 at Ex. 3. Additionally, the Retail Installment Sales Contract specifically identifies the seller as AA. *Id*. at Ex. 4. Neither of the documents indicates that Airstream was the merchant selling the RV to Powell. The deposition testimony of Richard March ("March"), the General Manager of the Customer Relations Group of Airstream, indicated that the RV was sold by them to AA and paid for by AA before it was delivered. March Dep. 30-31. Daniel Lamb ("Lamb"), the Parts and Service Manager for AA, testified in his deposition that although AA is an authorized dealer of Airstream's products, it is a separate entity from Airstream and is neither owned nor controlled by Airsteam. Lamb Dep. 95. Given this evidence, there is no question that pursuant to Washington law, Powell is a vertical non-privity plaintiff as he is in the distributive chain, but did not buy the RV directly from Airstream.

{¶21} Since Powell is a vertical non-privity plaintiff, the only way that an implied warranty would apply would be if Powell was an intended third-party beneficiary of the contract between Airstream and AA. *Babb v. Regal Marine Industries, Inc.* 186 Wash.App. 1003 (2015). Washington courts "have allowed a remote purchaser to pursue claims for breach of implied warranties of merchantability notwithstanding lack of vertical privity when the remote purchaser

can show that it was an intended third-party beneficiary of a contract involving the

manufacturer." *Id.* (citing *Touchet Valley Grain Growers, Inc. v. Opp & Seibold*

*Gen. Constr., Inc.*, 119 Wash.2d 334, 347, 831 P.2d 724 (1992)).

> **Our Supreme Court first applied the test to a claim for a breach of an implied warranty of merchantability in *Touchet Valley*. There, the [Court] examined *Kadiak Fisheries Co. v. Murphy Diesel Co.*, 70 Wn. 2d 153, 422 P.2d 496 (1967). In *Kadiak*, our Supreme Court held that a purchaser of a specially-built marine diesel motor could sue the manufacturer for breach of implied warranties even though the purchaser bought the diesel motor from a retail dealer. \* \* \* The *Kadiak* court relied on the sum of the interaction and the expectations between the purchaser and the manufacturer: (1) the manufacturer knew the identity, purposes, and requirements of the purchasers' specifications; (2) Kadiak had communicated its needs to the manufacturer, not only directly, but also through its agent, the supplier; (3) although the manufacturer invoiced the supplier, the manufacturer delivered the motor directly to Kadiak; (4) the manufacturer's representatives attended installation of the motor; and (5) after difficulties developed, the manufacturer tried to fix the motor's problem. \* \* \***
>
> **Applying *Kadiak's* reasoning, the *Touchet Valley* court concluded that the owner of a collapsed grain-storage facility could maintain an implied warranty action against a subcontractor with whom there was no privity because the owner was the intended third-party beneficiary of the contract between the general contractor and the subcontractor. \* \* \* In so holding, the [Court] determined that the subcontractor knew Touchet Valley's identity, its purpose, and its requirements for the storage building. \* \* \* The subcontractor had also designed the building to the purchaser's specifications and delivered components to the construction side. \* \* \* And when the building first began to collapse, the subcontractor helped to attempt repairs.**
>
> **In contrast, in *Urban Development, Inc. v. Evergreen Building Products, LLC*, \* \* \* Division One of this court declined to extend implied warranties of merchantability to a general contractor of**

> **a leaking condominium complex when there was no privity of contract between the general contractor and the manufacturer of the building's siding. The court there so held because the general contractor had no interaction with the siding manufacturer and because the manufacturer did not design the siding system specifically for the contractor's requirements.**

*Babb, supra.* The *Babb* court then went on to note that in the case before it, the manufacturer did not know the purchaser's identity or purpose and did not specifically build the boat with the purchaser's requirements in mind. Instead, the boat was merely an ordinary model built at the manufacturer's factory and then sold and shipped to a dealer. The dealer then sold the boat to the purchaser. When the dealer went bankrupt and the purchaser had issues with the boat, the manufacturer attempted to assist after the sale. The court then went on to find that the only interaction was a series of post-sale contacts "related to the repair of a boat that [the manufacturer] did not build specifically for [the purchaser]." *Id.* Based upon the facts of that case, the court found that the purchaser was not an intended third-party beneficiary of the contract between the manufacturer and the dealer and that the implied warranty of merchantability failed for lack of privity of contract. *Id.*

{¶22} In short, to be a third-party beneficiary, the purchaser must show that the manufacturer was involved in the transaction, knew the purchaser's identity and purpose, communicated with the purchaser regarding the purchase, or delivered the goods to the purchaser. *See Johnson v. Metro-Goldwyn-Mayer Studios Inc.,* W.D. Washington No. C17-541 RSM, 2017 WL 3313963 (Aug. 3, 2017). A third-party

beneficiary is not entitled to coverage pursuant to an implied warranty when a manufacturer is unaware of the party's identity or did not intend to sell to that specific party. *Id*. at *6. Here, the undisputed facts show that Airstream made a standard model RV and sold it to AA. Prior to the manufacture or sale of the RV at issue, there is no evidence presented of any contact between Airstream and Powell. This was not a special order and there is no evidence that Airstream knew who would purchase this RV. After the sale, most of the communication about the issues with the RV were between AA and Powell. March testified that he knew of one post-sale email and only a few phone calls. Most of the communication was between AA and Powell and then between AA and Airstream. The record does not support the conclusion that Powell was a third-party beneficiary of the sales contract between AA and Airstream. Since Powell lacks privity of contract with Airstream and is not a third-party beneficiary, he cannot avail himself of the implied warranty of merchantability against Airstream.

{¶23} *Express Warranties*

{¶24} Powell also argues that Airstream violated the express warranty. Express warranties are any affirmation of fact or promise, any description, or any sample or model by a seller relating to or describing the goods when such representation forms the basis of the bargain. RCW 62A.2–313. At the time of purchase, Powell was provided with a limited warranty on the travel trailer. This warranty provided as follows in pertinent part.

**THIS LIMITED WARRANTY COVERS: (i) ONLY the first retail owner and any second owner (ii) ONLY those portions of a NEW travel trailer not excluded under the section "What is Not covered", when sold by an authorized dealership; and (iii) ONLY defects in workmanship performed and/or materials used to assemble those portions of your travel trailer not excluded under the section "What is Not Covered". "Defect" means the failure of the workmanship performed and/or materials used to conform with the design and manufacturing specification and tolerances of Airstream. \* \* \***

**\* \* \***

**LIMITATION OF IMPLIED WARRANTIES**

**IMPLIED WARRANTIES ARISING UNDER APPLICABLE LAW, IF ANY INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY LIMITED IN DURATION TO THE TERM OF THIS LIMITED WARRANTY AND ARE LIMITED IN SCOPE OF COVERAGE TO THOSE PORTIONS OF THE TRAVEL TRAILER COVERED BY THE LIMITED WARRANTY. THERE ARE NO EXPRESS WARRANTIES OR ANY IMPLIED WARRANTIES OF MERCHANTABILITY ON THOSE PORTIONS OF THE TRAVEL TRAILER EXCLUDED FROM COVERAGE. There is no warranty of any nature made by Airstream beyond that contained in this Limited Warranty. \* \* \***

**REPAIR REMEDY: Airstream's sole and exclusive obligation is to repair any covered defects discovered within the warranty coverage period if: (1) within 10 days of your discovery of a defect you notify Airstream OR an authorized dealership of the defect; AND (2) you deliver your travel trailer to Airstream OR an authorized dealership at your cost and expense.**

**BACK-UP REMEDY: If the primary repair remedy fails to successfully cure any defect after a reasonable number of repair attempts, your sole and exclusive remedy shall be to have Airstream pay an Independent service shop of your choice to perform repairs to the defect OR if the defect is incurable, have**

**Airstream pay diminution in value damages. The repair remedy and the back-up remedy MUST both be exhausted AND those remedies must fail to fulfill their essential purpose before you can seek any legal or equitable relief.**

**\* \* \***

**WHAT IS NOT COVERED**

**1.      Tires, batteries, stereo, television, range/stove, furnace, refrigerator, air conditioner, toilet, water heater, microwave generator, glass breakage, and other materials, parts and component warranted by persons or entities other than Airstream.  Please refer to the warranties of component manufacturers for terms and conditions of coverage;**

**2.      Accessories and equipment that are working as designed, but which you are unhappy because of the design**

**3.      Any part or component of the travel trailer that was not manufactured or installed by Airstream;**

**4.      Normal deterioration due to wear or exposure, including but not limited to upholstery, flooring rust, corrosion, oxidation, and cosmetic blemishes.**

**5.      Normal maintenance and service items, including but not limited to light bulbs, fuses, lubricants, sealants and seals, door adjustments, and awning tension;**

**6.      After market equipment or accessories installed on the travel trailer after completion of manufacture by Airstream, or any defects or damage caused by such items;**

**\* \* \***

**8.      Defects or damage caused by, in whole or in part, or in any way related to:  Accidents, misuse (including off-road use), or negligence; Failure to comply with the instructions set forth in any owner's manual provided with the travel trailer; Alteration or modification of the travel trailer except such alterations or modifications approved in writing by Airstream; Acts of God or**

**other environmental conditions, such as lightning, hail, salt causing rust, or other chemicals in the atmosphere; De-icing agents or other chemicals applied to the travel trailer; Failure to properly maintain or service the travel trailer, including but not limited to the maintenance of lubricants, sealants, and seals; Condensation and the results of condensation including water damage and the growth of mold or mildew. Mold and mildew are natural growths given certain environmental conditions and are not covered by the terms of this Limited Warranty; The addition of weight to the travel trailer that causes the total weight to exceed applicable weight ratings, or additions of weight causing improper distribution of the weight of the travel trailer; Failure to seek and obtain repairs in a timely manner; Failure to use reasonable efforts to mitigate damage caused by defects; Failure to properly ventilate the travel trailer; Improper electric power supply or improper travel trailer hookup to other facilities; Acts or omissions of any person or entity other than Airstream.**

**DISCLAIMER OF INCIDENTAL AND CONSEQUENTIAL DAMAGES**

**Airstream disclaims any and all incidental and consequential damages, including but not limited to expenses such as transportation to and from dealerships and Airstream repair facilities, loss of time, loss of pay, loss of use, inconvenience, commercial loss (including but not limited to lost profits), towing charges, bus fares, vehicle rental, service call charges, gasoline expenses, incidental charges such as telephone calls and facsimile transmissions, and expenses for lodging and moisture damages such as mold and mildew as well as rust and corrosion. This disclaimer is independent of any failure of the essential purpose of any warranties provided with the travel trailer, and shall survive any determination that a warranty failed of its essential purpose. \* \* \***

**\* \* \***

**If you believe a defect covered by this Limited Warranty still exists after an attempted repair by an authorized Airstream dealer, you must contact Airstream at the following address, specifying:**

1.  **The complete serial number of the travel trailer;**
2.  **The date of original purchase and the date of original delivery;**
3.  **The name of the selling dealer; and**
4.  **The nature of the problem and the steps or service which has been performed.**

\* \* \*

**Airstream may direct you to an authorized Airstream dealer, or may request that you bring your travel trailer to the Airstream factory in Jackson Center, Ohio for repairs.**

**Airstream does not control the scheduling of repairs at its authorized Airstream dealers, and repairs at the Airstream factory may not be immediately available. Therefore, you may encounter delays in scheduling repairs and/or completion of repairs. All costs associated with transporting the travel trailer for any warranty service shall be the sole responsibility of the owner.**

Doc. 7, Ex. A.

{¶25} Powell claims that Airstream breached its express warranty by failing to correct the issues with the RV within a reasonable time and with a reasonable number of repair attempts. As noted by the trial court, there were many issues with the RV. However, a review of the warranty shows that many of these issues were not warranty issues. The warranty specifically excluded issues with the furnace, toilet, stove, air conditioner, refrigerator, and doors, including the door adjustments. Additionally, issues with the awning were excluded as it was a component covered by a third party warranty and only installed by Airstream. March Dep. 27. Although AA and Airstream addressed many of these issues for the benefit of the customers,

the warranty coverage was provided by third parties. Excluding the issues clearly excluded under the warranty, a view of the evidence in a light most favorable to Powell shows the following repeat problems: 1) bath fan rattling; 2) drawer in the bedroom opening in transit; 3) 30 amp outlet lights going out on the receptacles; 4) water pooling in the shower; 5) rivet head popping out in transit;[4] and 6) a squeaky floor.[5] The record shows that most of these issues were corrected each time they were brought in, however some of them came back. The bath fan rattling resulted from wires coming loose or a screw coming loose allowing the fan to hit the housing. The problem with the bedroom drawer was resolved by changing the 5 lb. catches to 10 lb. catches, which allowed for more pressure during transit. AA noted during one repair that the catches were working as designed, but were not strong enough for the customers' purposes. The 30 amp outlet lights did keep going out and were repeatedly replaced. The new one would work for a while, but the light in the new ones would eventually fail as well. The issue with the shower was completely resolved when the shower was replaced and all the fittings were tightened. The rivet

---

[4] Without knowing exactly which rivets were coming loose, it is difficult for this court to know if it is a repeat issue as in the same rivet, or is in a different location. However the undisputed testimony is that frequently rivets do come loose during transit and have to be replaced. As we are viewing the evidence in a light most favorable to Powell, we will treat this as a repeat issue.

[5] This Court notes that there were other issues that repeated according to the customers, but some of these, such as the fantastic fan becoming inoperable or issues with the air conditioning fan and furnace running at the same time were due to user error. Some other issues listed showed that the component was functioning as designed. The customer just did not like that aspect. However, this type of issue is specifically excluded by the warranty. The remaining issues were either repaired the first time or were for a component excluded by the terms of the warranty. Additionally, in its motion opposing summary judgment, Powell listed additional complaints such as "excessive mold growth on the exterior of the RV." However, these alleged additional issues were not brought to the attention of Airstream and thus cannot be considered when determining whether Airstream breached the terms of its express warranty.

heads were resolved by drilling out the old rivets and replacing them with new ones. Although the squeaky floor was noted, it was checked and no issues were found.

{¶26} Even if Airstream failed to repair everything according to the warranty, Powell failed to follow the terms of the warranty. The Back Up Remedy of the warranty provides that if Airstream has not successfully repaired the issue after a reasonable attempt, the purchaser has the right to take the RV to an independent repair facility to get the issue resolved and that Airstream will pay for the repairs. If the issue cannot be remedied, Airstream will then pay diminution in value. This is the sole and exclusive remedy permitted under the terms of the warranty. Instead of trying to get a third party to repair the RV and have Airstream pay for those repairs, Powell instead chose to request to rescind the sales contract and have Airstream give him his money back.[6] This is not a remedy offered under the warranty. The warranty specifically provides that "the repair remedy and the back-up remedy MUST both be exhausted AND those remedies must fail to fulfill their essential purpose before you can seek any legal or equitable relief." This portion of the warranty was listed in bold print and was not hidden. Powell has not exhausted his remedies under the warranty. Thus, pursuant to the terms of the warranty, he is not entitled to seek legal or equitable relief at this time.

---

[6] This court notes again that Powell did not purchase the RV from Airstream, but from AA. AA purchased the RV from Airstream.

{¶27} Powell also argues that the terms of the limited warranty should not be applied because it failed of its essential purpose.

> **Under the Uniform Commercial Code, a limitation of remedy clause is ineffectual when it deprives a party of the substantive value of its bargain. Wash.Rev.Code § 62A.2–719. Limited remedies clauses fail of their essential purpose in two situations, one of which is "when the seller or other party required to provide the remedy, by its action or inaction, causes the remedy to fail." Marr Enterprises, Inc. v. Lewis Refrigeration Co., 556 F.2d 951, 955 (9th Cir.1977). Typically, cases in this category are those in which the plaintiff's remedy was limited solely to repair or replacement of defective parts and the seller failed to replace or repair in a reasonably prompt and non-negligent manner.**

*Polygon Northwest Co. LLC v. Louisiana-Pacific Corp.*, W.D. Wash No. C11-620 MJP, 2012 WL 2504873 (June 28, 2012). "When there are alternate exclusive limited remedies, such as repair or refund, the exclusive remedies have been held not to fail of their essential purposes, although there was a failure to repair or replace the defective parts." *American Nursery Products, Inc. v. Indian Wells Orchards*, 115 Wash.2d 217, 229, 797 P.2d 477 (1990).

{¶28} Pursuant to the language of the warranty, the purpose in this case was to 1) allow an Airstream dealer to repair any alleged covered defects, 2) if the dealer could not successfully repair the alleged covered defect, permit the owner to take it to a third party for repair at Airstream's cost, and 3) if the alleged defect was not curable, allow the owner to receive the diminution in value. As discussed above, the repairs were all successfully completed within one to three attempts excluding those for which the problem could either not be duplicated or no issue could be

found. Although Powell and the customers did take the RV to AA, an authorized dealer for repairs, when those repairs did not meet their expectations, they did not attempt to arrange for a third party to repair the RV at Airstream's expense. Airstream gave Powell an alternative to continuing to allow Airstream's dealers to attempt to repair the issues, but Powell did not avail himself of this option. As there were alternatives, the warranty did not fail of its essential purpose.

**{¶29}** Powell also argues that the back up remedy should fail because he would not have purchased the RV if he had known about the "secret" back up remedy provision prior to the purchase. This court notes that even assuming that Powell did not receive a copy of the warranty until he picked up the RV, he did receive a copy of it.[7] The customers then proceeded to use the RV for more than a year after receiving the warranty. The customers even took advantage of the warranty by having items repaired at no charge. Even assuming that the purchase contract was voidable because Powell did not know all of the terms, i.e. the back up remedy in the limited warranty, a party ratifies those terms if he or she remains silent or continues to accept the benefits of the contract after discovering the unknown provisions. *Ward v. Richards & Rossano, Inc., P.S.*, 51 Wash.App. 423, 433, 754 P.2d 120 (1988). By using the RV and the warranty, Powell ratified the provisions in the limited warranty, including the back up remedy.

---

[7] The back up remedy was not hidden amongst the fine print of the limited warranty. The copy of the warranty provided by Powell shows that the back up remedy was labeled in bold print and all capital letters on the first page right under the repair remedy. It was clearly placed for anyone to view.

{¶30} Powell also argues three other issues: 1) Airstream waived the back up remedy, 2) the back up remedy left him with no remedy, and 3) the back up remedy was against public policy. A review of the record shows that these issues were neither raised in the initial complaint nor in the response to the motion for summary judgment. This Court has long held that issues that were not, but could have been, raised in the trial court may not be raised for the first time on appeal. *Cortez v. Smith*, 3d Dist. Defiance No. 4-95-5, 1995 WL 505928 (Aug. 10, 1995). Powell could have argued these claims in the trial court, but did not. Thus, we will not address them on appeal.

*Magnuson-Moss Warranty Act*

{¶31} The third claim raised in the complaint was that Airstream violated the Magnuson-Moss Warranty Act. The "Act limits the ability of manufacturers to disclaim or modify implied warranties in cases where they have offered express warranty protection." *Curl v. Volkswagon of Am. Inc.*, 114 Ohio St.3d 266, 2007-Ohio-3609, ¶ 10, 871 N.E.2d 1141. It does not create new implied warranties or otherwise modify the implied warranties existing according to state law. *Id.* Rather, the Act adopts the implied warranty protections previously established under the governing state law. *Id.* "Claims under the Magnuson–Moss Act stand or fall with [the] express and implied warranty claims under state law." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008). The outcome of the state law warranty claims determines the disposition of the Magnuson-Moss Act

claims. *Id.* If the underlying state warranty claims are dismissed, the Magnuson-Moss Act claims must also be dismissed. *Id.*

**{¶32}** Here, Powell brought the Magnuson-Moss Act claims based on violation of the limited and express warranties pursuant to the law in the state of Washington. This Court addressed the alleged breaches of the express and limited warranties above. The conclusion reached was that Airstream did not breach the express warranty and that Powell lacked privity to contract to recover on the theory of implied warranties. Since the underlying state warranty claims fail, as a matter of law the federal claims under the Magnuson-Moss Act must also fail.

*Washington Consumer Protection Act*

**{¶33}** Powell also claims that Airstream violated the Washington Consumer Protection Act ("CPA") by violating the warranties and the Moss-Magnuson Act and by deceiving the general public. "To prevail on a CPA action, the plaintiff must prove an '(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation.' " *Klem v. Washington Mut. Bank*, 176 Wash. 2d. 771, 782, 295 P.3d 1179, (2013) (quoting *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 780, 719 P.2d 531 (1986)). If a plaintiff does not satisfy each of these elements, the CPA claim must fail. *Rush v. Blackburn*, 190 Wash. App. 945, 961, 361 P.3d 217 (2015). The determination of whether an act is unfair or deceptive is a question of law, not fact. *Id.*

**{¶34}** The purpose of the CPA is to address acts injurious to the public. RCW 19.86.920. Thus, a plaintiff bringing a cause of action pursuant to the CPA must show that there was a public interest impact resulting from the alleged deceptive act. *Id*. To determine if the act affects the public, courts should look to see if the acts form a pattern, whether they have been repeated, or if the alleged deceptive acts affected many consumers. *McLaughlin v. Watercraft International, Inc.*, 87 Wash.App.1051 (1997).

**{¶35}** Here, Powell claims that there was deceptive acts by Airstream when it breached its warranty. This court has already determined that there was no breach of warranty, so it cannot be a deceptive act. Powell also claims that by advertising that the RV was well made and would last a long time, Airstream was deceptive. However, the only evidence of this was that this specific RV had many issues and was not up to the quality expected by Powell. Powell presented no evidence that there was a pattern of behavior or that it affected many consumers. An isolated incident, i.e. putting a subpar RV into the commerce stream, while it may affect a few consumers catastrophically, does not necessarily affect a large number of consumers as is necessary to establish a claim under the CPA. *McLaughlin, supra.* Without any evidence that an allegedly deceptive or unfair act is likely to be repeated or has affected a large number of consumers, there is no public impact as is required for a claim under the CPA. *Id*. Since the undisputed evidence does not show that there was a public impact in this case, the CPA claim must fail.

**{¶36}** Having reviewed all of the claims raised in the complaint and the arguments raised in the memorandum contra to the motion for summary judgment, the undisputed evidence shows that there are no material issues of fact. Viewing the evidence in a light most favorable to the nonmoving party, reasonable minds can only reach one conclusion and that conclusion is adverse to the nonmoving party. The motion for summary judgment was properly granted and the assignment of error is overruled.

**{¶37}** Having found no error in the particulars assigned and argued, the judgment of the Court of Common Pleas of Shelby County is affirmed.

*Judgment Affirmed*

**SHAW and PRESTON, J.J., concur.**

**/hls**