IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| EASTSIDE PHYSICAL THERAPY, INC., P.S., a Washington corporation, and SUMMIT PHYSICAL THERAPY, LLC, a Washington limited liability company, | ) ) ) ) ) | No. 78134-1-I DIVISION ONE UNPUBLISHED OPINION |
| Appellants, | ) ) | |
| v. | ) ) | |
| UNITED SERVICES AUTOMOBILE ASSOCIATION and USAA CASUALTY INSURANCE COMPANY, | ) ) ) ) ) | |
| Respondents. | ) ) | FILED: September 30, 2019 |

ANDRUS, J. — Eastside Physical Therapy, Inc. and Summit Physical Therapy, LLC appeal the dismissal of their Consumer Protection Act (CPA) claims against United States Automobile Association and USAA Casualty Insurance Company (collectively, "USAA"), insurers who provided PIP coverage to Eastside and Summit patients. We affirm the dismissal of Summit's claim but reverse the dismissal of Eastside's claim and remand in light of this court's decision in Folweiler Chiropractic, P.S. v. American Family Insurance Company, 5 Wn. App. 2d 829, 429 P.3d 813 (2018).

## FACTS

Eastside and Summit are health care providers that treated patients with Personal Injury Protection (PIP) coverage under auto policies issued or

underwritten by USAA. One of USAA's insureds, "LJ,"[1] sustained physical injuries in a December 2016 accident and received treatment from Eastside.

LJ purchased $10,000 in PIP coverage. Their policy provided:

**We** will pay the following PIP benefits to or on behalf of each **covered person** because of [bodily injury] caused by an accident arising out of the ownership, maintenance or use of an auto:

    1. Medical and hospital benefits.

    . . .

**We** or someone on our behalf will review, by audit or otherwise, claims for benefits under this coverage to determine if the charges are **medical payment fees** for **medically necessary and appropriate medical services**. . . . A provider of medical services . . . may charge more than the amount **we** determine to be **medical payment fees** and reasonable expenses, but such additional charges are not covered.

The policy defined "medical payment fee" as "an amount, as determined by us . . . that **we** will pay for charges made by a licensed hospital, licensed physician, or other licensed medical provider for **medically necessary and appropriate medical services**." It went on to provide:

The amount that **we** will pay will be one of the following:

    . . .

    4. The lesser of the following:

        a. The actual amount billed; or

        b. A reasonable fee for the service provided. A fee is reasonable if it falls within the range of fees generally charged for that service in the geographic area.

Eastside submitted three bills to USAA on behalf of LJ for services it

---

[1] The parties have maintained the patients' anonymity by designating them by the initials "LJ." We do the same here.

provided in January and February 2017. Each bill charged $134.00 for a particular procedure identified as "Ther px 1/> areas each 15 mins neuromusc." USAA initially reimbursed Eastside $115.76 for this procedure on the first two bills, and $122.48 for that same procedure on the third bill. On an "Explanation of Reimbursement," or "EOR," USAA identified a reason code, called "RF_3." "RF_3" meant that "the charge exceeds a reasonable amount for the service provided." USAA notified Eastside that if it did not accept the recommended amount as payment in full, then it could submit additional documentation or an explanation to support the reasonableness of the charge. At Eastside's request, USAA reconsidered the bills and on July 19, 2017, paid the charges in the second and third bills in full.

As of August 28, 2017, USAA had paid out the full amount of LJ's $10,000 PIP coverage, with $5,127.76 being paid to Eastside. USAA sent Eastside a letter notifying it that LJ's PIP limits had been exhausted.

USAA uses a database, known as the Milliman database, to determine reimbursement rates on provider bills. The parties have identified the use of this database as the "RF Methodology," or Reasonable Fee Methodology. In an earlier lawsuit against USAA, a court order approving a class action settlement described the RF Methodology:

> The "RF Methodology" in Washington currently involves the use of the 80th percentile of the Milliman, Inc. ("Milliman") database of charges for Washington providers (and the Milliman database in turn relies on charge data from the U.S. Department of Health and Human Services/Centers for Medicare and Medicaid Services (the "CMS Data")), with adjustments for inflation, if appropriate, and application of a $10/5% "rounding rule" (i.e., if the reasonable fee recommended by the Milliman database is less than the greater of $10 or 5% of the provider's billed amount, then the USAA Entities will

pay the provider's billed amount in full).

The 80th percentile data is not organized by a provider's years of experience, background or qualifications; it merely compares the amount billed against what other providers in the same geographical area charge for the same medical billing code. If USAA has an assignment of benefit from its insured, it pays the provider directly rather than reimbursing the insured. Eastside and Summit billed USAA directly for the treatment it provided to USAA insureds.

In October 2017, Eastside brought this class action against USAA in King County Superior Court, alleging that its reimbursement practices violated the CPA. Summit joined as a co-plaintiff in December 2017. Eastside and Summit alleged that over a period from May 30, 2015 to October 13, 2017, USAA violated RCW 48.22.005(7) by failing to pay all reasonable medical expenses and violated WAC 284-30-330 by failing to implement a reasonable procedure for investigating PIP insurance claims before it refused to pay them in full. Eastside and Summit challenged USAA's use of the RF Methodology, contending it is a systematic failure to investigate the reasonableness of PIP claims. Eastside and Summit sought damages on behalf of themselves and a class of 1,100 similarly situated Washington health care providers. The claimed injuries included loss of income from the underpayment of bills, delayed payment of bills, administrative costs to "address USAA's wrongful conduct," and out-of-pocket expenses.

In January 2018, USAA filed a CR 12(b)(6) motion to dismiss the complaint, arguing that the final settlement order in MySpine P.S. v. USAA Casualty Insurance Company, no. 12-2-32635-5 SEA (Wash. Super. Ct. Sept. 11, 2015), explicitly allowed USAA to continue using the RF Methodology to determine

reimbursement to providers. USAA further argued that Eastside's and Summit's claimed damages were not compensable injuries under the CPA.

USAA simultaneously filed a motion for summary judgment. USAA argued that Eastside could not pursue a CPA claim for nonpayment based on its patient LJ because LJ's PIP policy limits had been exhausted. USAA claimed that Summit, as a MySpine class member, was barred from bringing a suit to challenge USAA's use of the RF Methodology for five years following the MySpine final settlement order.

Eastside and Summit moved to transfer the lawsuit from the assigned judge to Judge Theresa Doyle, who had presided over and entered the final settlement order in MySpine. Eastside and Summit argued that Judge Doyle had "expressly reserved jurisdiction over that settlement to resolve any issues relating to the enforcement, and interpretation of the terms of the settlement and Final Approval Order." The chief civil judge denied the motion to transfer.

In February 2018, the trial court dismissed Summit's claim based on the MySpine settlement, and dismissed Eastside's claim, concluding that the PIP policy exhaustion barred the claim and, alternatively, that Eastside had not sustained a cognizable CPA injury. Eastside and Summit appeal the orders dismissing their claims and denying transfer of the case to Judge Doyle.

ANALYSIS

Eastside's CPA Claim

Eastside's appeal raises three issues: first, whether the exhaustion of LJ's PIP benefits bar Eastside's CPA claim; second, whether Eastside presented evidence of cognizable CPA injuries to business or property; and third, whether

Eastside has standing to challenge USAA's use of the RF Methodology as either a per se violation of the CPA or an unfair practice under Folweiler.

We review an order of summary judgment de novo, performing the same inquiry as the trial court and considering the facts and inferences in a light most favorable to the nonmoving party. Jones v. Allstate Ins. Co., 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). Summary judgment is appropriate if the pleadings, affidavits, and depositions establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Id. at 300-01.

Washington's CPA makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. To establish a CPA violation, a challenger must establish: (1) an unfair or deceptive act or practice; (2) in trade or commerce; (3) a sufficient showing of public interest; (4) injury to business or property; and (5) a causal link between the unfair acts and injury. Nordstrom, Inc. v. Tampourlos, 107 Wn.2d 735, 739, 733 P.2d 208 (1987).

(1) PIP Policy Exhaustion

The trial court held that Eastside could not recover from USAA because LJ's PIP coverage limits were exhausted before Eastside filed the lawsuit. USAA argues that because coverage limits were exhausted, an insured cannot recover any additional funds from USAA, citing to Dees v. Allstate Ins. Co., 933 F. Supp. 2d 1299, 1306 (W.D. Wash. 2013), Sadler v. State Farm Mut. Auto Ins. Co., 2008 WL 4371661 (W.D. Wash. 2008), Kabrich v. Allstate Prop. & Cas. Ins. Co., 2014 WL 3925493 (E.D. Wash. 2014), and Isilon Sys., Inc. v. Twin City Fire Ins. Co.,

2012 WL 1202331 (W.D. Wash. 2012). It argues that if LJ cannot recover CPA damages, Eastside cannot do so either.

None of these cases, however, preclude an insured from suing an insurer for CPA damages just because the insurer has paid out policy limits. In Dees, an insured sued its PIP carrier for breach of contract, breach of the duty of good faith and fair dealing, CPA violations, and violations of the Insurance Fair Conduct Act. On summary judgment, the insurer sought a ruling that its maximum liability to Dees under a breach of contract theory was the maximum PIP benefit of $35,000 and UIM benefit of $100,000. 933 F. Supp. 2d at 1306. Dees agreed with this proposition, and the court granted the insurer's partial summary judgment, concluding that "[i]f Allstate is liable for breach of contract, its damages for that breach are limited to [the unpaid portion of the PIP and UIM policies]." Id. But that ruling was limited to the breach of contract claim, not Dees's CPA claim.

Sadler involved an injured insured who sued her PIP insurer under various legal theories, including breach of contract and the CPA, contending the insurer's delay in processing her claim for PIP coverage led to an exacerbation of her personal injuries. 2008 WL 4371661 at *1, *6. The court dismissed Sadler's breach of contract claim because State Farm had paid out its policy limits, id. at *7, but the court dismissed the CPA claim, not because the policy limits had been exhausted, but because the court determined that the plaintiff's damages for personal injuries were not a cognizable injury under the CPA, id. at *9.

In Kabrich, a plaintiff sued her insurer for breach of a homeowner's policy and for bad faith denial of benefits under that policy. 2014 WL 3925493 at *1. The insurer had paid out policy limits for personal property destroyed during a freezing

event. Id. at *1-2. The court dismissed Kabrich's breach of contract claim because "[a]n insured may only recover damages up to the policy limits in an insurance breach of contract action." Id. at *7. The court also dismissed her CPA claim because she had "produced no evidence suggesting that she was underpaid by Allstate." Id. at *10.[2] The dismissal of the CPA claim turned on the sufficiency of the plaintiff's proof, not the exhaustion of policy limits.

Finally, in Isilon, an insured corporation sued its liability insurer for breach of contract, bad faith denial of coverage, and CPA and IFCA violations after the insurer initially denied to provide a defense to the company's CFO for alleged securities fraud. 2012 WL 1202331 at *3. The court dismissed Isilon's CPA claim because the insurer had paid the full policy limits to Isilon within the 90-day contractual window for the payment of claims, and the additional damages Isilon sought had not been properly pleaded or were otherwise not recoverable under the CPA. Id. It did not hold that exhaustion of policy limits precluded Isilon from pursuing a CPA recovery.

We find Van Noy v. State Farm Mut. Auto. Ins. Co. to be more analogous to this case. There, this court held that a class of State Farm PIP policyholders could pursue contract and bad faith claims against their first party insurer for retroactively disallowing claims for medical expenses. 98 Wn. App. 487, 983 P.2d 1129 (1999). This court rejected State Farm's argument that it could not be liable for damages in excess of the benefits due under the policy. Id. at 497. The court

---

[2] The Kabrich court, however, noted that successful claimants showing actionable bad faith in third party insurance context can receive awards in excess of policy limits under Coventry Associates v. American States Ins. Co., 136 Wn.2d 269, 961 P.2d 933 (1998). Id. at *8, fn.5.

held that the plaintiffs could pursue their claim for damages based on the allegation that the delay in disallowing medical expenses caused them to incur personal liability for bills they would have otherwise not incurred. Id.

Because Eastside's request for payment predated the exhaustion of LJ's policy limits by several months, and the conduct that arguably violated the CPA similarly predated exhaustion, we conclude that policy limit's exhaustion does not bar Eastside's CPA claim under Van Noy.

USAA argues that Eastside's admission in the complaint that it was excluding reductions made to bills "submitted on PIP claims with exhausted policy limits" is a judicial admission that we should deem conclusively binding on Eastside. Eastside, however, explained that this statement was meant to exclude bills submitted to USAA after a policy limit had been reached. A judicial admission is "[a] formal admission[] in [a] pleading which [has] the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." American Title Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988) (quoting In re Fordson Eng'g Corp., 25 B.R. 506, 509 (Bankr. E.D. Mich. 1982)). Eastside's statement in its complaint is not a statement of fact, but a description of its claim, and an ambiguous one at that. We thus reject USAA's argument that the judicial admission doctrine applies here.

Because Eastside's CPA claim accrued before LJ's policy limits were exhausted, the subsequent payout of the full $10,000 in PIP benefits does not bar the claim as a matter of law. The trial court erred in concluding otherwise.

(2) Cognizable CPA Injury

The trial court also concluded that, as an alternative basis for dismissing Eastside's CPA claim, Eastside failed to establish a cognizable CPA injury. RCW 19.86.090 provides "[a]ny person who is injured in his or her business or property" by a violation of the CPA may bring an action to enjoin further violations or to recover "actual damages sustained by him or her." No monetary damages need be proven and non-quantifiable injuries will suffice. Nordstrom, 107 Wn.2d at 739; see also Folweiler, 5 Wn. App. at 839. The injury requirement is met "upon proof the plaintiff's property interest or money is diminished because of the unlawful conduct even if the expenses caused by the statutory violation are minimal." Panag v. Farmers Ins. Co. of Wash., 166 Wn.2d 27, 57, 204 P.3d 885 (2009) (internal quotation marks omitted) (quoting Mason v. Mortgage Am., Inc., 114 Wn.2d 842, 854, 792 P.2d 142 (1990)). "[A] mere delay in use of property or receiving payment is an injury under the CPA." Folweiler, 5 Wn. App. 2d. at 839; see also Sorrel v. Eagle Healthcare, Inc., 110 Wn. App. 290, 298, 38 P.3d 1024 (2002).

Eastside identified two injuries—the four- or five-month delay in being paid in full on the second and third invoices and the underpayment on the first invoice. In Folweiler, this court recently held that delay in reimbursement by an insurer is a cognizable CPA injury:

> Folweiler pleaded that it suffered injury: "[d]uring the period from July 8, 2012 to July 8, 2016, Folweiler suffered injury and damage to its business as a direct and proximate result of American Family's practice of making P0041 reductions to Washington provider bills in the manner described above." The complaint further alleged that class members "sustained injury to their business caused by American Family's practice *in the form of reduced payments, delay*

*in payment of reasonable medical expenses,* out of pocket administrative costs or added expenses, [or] business interruption or inconvenience." Folweiler sufficiently pleaded injury under the CPA.

Folweiler, 5 Wn. App. 2d. at 839-40 (emphasis added). This holding was based on Sorrel v. Eagle Healthcare, Inc., in which the court held that a delay in receiving a refund to which the plaintiff was entitled constituted an injury to property under the CPA. 110 Wn. App. at 298. Both Folweiler and Sorrel support Eastside here. The trial court erred in concluding that a delay in payment is not a valid CPA injury.

USAA argues that an alleged underpayment of a medical bill is not recoverable under the CPA under Ambach v. French, 167 Wn.2d 167, 216 P.3d 405 (2009). This reading of Ambach is not warranted by the facts of that case. In Ambach, the plaintiff contracted a staph infection following shoulder surgery and brought a professional malpractice and CPA claim against the surgeon. 167 Wn.2d at 170. The trial court dismissed the CPA claim because Ambach alleged a personal injury, not an injury to her "business or property." Id. at 170-71. Our Supreme Court agreed, reasoning that where a plaintiff is both physically and economically injured by one act, the economic damages flowing from the physical injury are not an "injury to business or property" as that term is used in our consumer protection laws. Id. at 174. It concluded that the expense for the surgery from which the personal injury arose was not a harm to Ambach's "property" within the meaning of the CPA. Id. at 178-79.

In Williams v. Lifestyle Lift Holding, this court distinguished Ambach. There, the plaintiff paid for cosmetic surgery marketed as a "minor one-hour procedure with major results," and requiring "no dangerous general anesthetic." 175 Wn. App. 62, 64-65, 302 P.3d 523 (2013). Williams, however, underwent regular

cosmetic surgery; she was sedated and woke up four hours later with her face wrapped in bandages. Id. at 68. Williams experienced numerous complications from the surgery and underwent a second surgery by a different physician. Id. at 69.

Williams sued, claiming negligence, lack of informed consent, and violations of the CPA. Id. at 69. This court reversed the dismissal of Williams' CPA claim. Id. at 64. This court distinguished Ambach because Williams did not claim that a single act caused both her personal injury and her economic loss. Instead, she contended her CPA injury, the cost of the cosmetic surgery, was incurred as the result of the defendant's deceptive advertising techniques. Id. at 73. Unlike in Ambach, Williams's CPA claim did "not depend on proof that [Williams] sustained a personal injury as a result of the surgery." Id.

As in Williams, we have two separate acts here: the tortfeasor's initial act of causing a car accident and injuring LJ, and USAA's separate and independent act of denying full reimbursement to Eastside, LJ's provider. Eastside's claim is based on the second act, not the first. We agree with Eastside that under Williams, the holding of Ambach does not apply. Thus, Eastside's claimed injury is sufficient to proceed under the CPA. The trial court erred in concluding that Eastside failed to establish a cognizable CPA injury to property.[3]

---

[3] We do not suggest that Eastside sustained any "actual damages." The record does not indicate whether USAA paid additional Eastside invoices after February 2017 and before the PIP limits were exhausted. We thus leave this issue for the parties to resolve on remand.

(3) <u>Standing to Challenge RF Methodology under Folweiler</u>

USAA urges this court to affirm the summary judgment on alternative grounds raised below. First, it argues Eastside failed to allege an unfair practice within the meaning of the CPA. Second, USAA contends Eastside lacks standing to pursue this claim.

Folweiler, which issued after the summary judgment in this case, disposes of both arguments. In Folweiler, a chiropractic clinic contended that American Family violated the CPA by relying on a computer database to determine the rate it would pay for medical expenses submitted by Washington providers. 5 Wn. App.2d at 833. This court reversed the trial court's dismissal of that claim on CR 12(b)(6):

> On their face, RCW 48.22.095(1)(a) and RCW 48.22.005(7) require payment of "all reasonable and necessary expenses incurred by or on behalf of the insured." The statutes necessarily impose a duty to look at each claim individually in order to determine the reasonable and necessary expenses for the *insured*. The law requires an individualized assessment rather than substituting a formulaic approach that pays only 80 percent of the average charge for a large geographic area.

5 Wn. App.2d at 838. This court held that failing to undertake an individualized assessment and using a geographic based formula regardless of the individual circumstances constitutes an unfair act in violation of the CPA. <u>Id.</u> at 839. Given that Eastlake's claim is identical to that raised by Folweiler, Eastlake has alleged an unfair practice under the CPA.

Folweiler also addressed USAA's standing argument. Folweiler, like Eastlake, alleged a per se violation of the CPA through a violation of insurance statutes and regulations. This court held that only an insured could bring this per

- 13 -

se claim. 5 Wn. App. 2d at 836; see also Tank v. State Farm Fire & Cas. Co., 105 Wn.2d 381, 394, 715 P.2d 1133 (1986); Pain Diagnostics & Rehab. Assocs., P.S. v. Brockman, 97 Wn. App. 691, 698, 988 P.2d 972 (1999). We agree with USAA that Eastside cannot maintain a per se CPA claim against USAA.

But Eastside, like Folweiler, also alleged that the insurer's reimbursement practices were an unfair practice that violated the CPA. This court held that Folweiler could pursue this "case-specific" claim. 5 Wn. App.2d at 837. In Klem v. Wash. Mut. Bank, our Supreme Court held that a party may predicate a claim under the CPA on a per se violation of statute, an act or practice that has the capacity to deceive substantial portions of the public, or an unfair or deceptive act or practice not regulated by statute but in violation of public interest. 176 Wn.2d 771, 787, 295 P.3d 1179 (2013). The Folweiler court recognized that we have allowed the definition of "unfair" or "deceptive" practices to "evolve through a gradual process of judicial inclusion and exclusion." Folweiler, 5 Wn. App. 2d. at 837 (internal quotation marks omitted) (quoting Saunders v. Lloyd's of London, 113 Wn.2d 330, 344, 779 P.2d 249 (1989)). Thus, the plaintiff could prevail if it could show how the conduct was unfair or deceptive under a "case-specific analysis of those terms." Id. (internal quotation marks omitted) (quoting Rush v. Blackburn, 190 Wn. App. 945, 962, 361 P.3d 217 (2015)).

The Folweiler court evaluated the allegation that American Family was using a computerized program to reduce payments to medical providers under PIP policies. Like the RF Methodology used by USAA, the computerized reimbursement system used by American Family paid providers at a rate represented by the 80th percentile of charges from providers in the same

geographical area as compiled in a computerized database. Id. at 833. Noting that the PIP statutes, RCW 48.22.095(1)(a) (establishing minimum PIP coverage amounts) and RCW 48.22.005(7) (defining "medical and hospital benefits"), "impose a duty to look at each claim individually in order to determine the reasonable and necessary expenses for the *insured*," this court concluded that the use of this type of computerized system to set reimbursement rates is an unfair practice if there is no individualized assessment to determine the reasonableness of the charge for a particular insured.[4] Id. at 838.

Eastside's allegations here are identical to those raised in Folweiler. Eastside challenges USAA's use of its RF Methodology, alleging that it systematically denies full payment of medical expenses because it fails to assess an insureds' individual needs. But USAA denies this. USAA presented evidence that it permitted Eastside to demonstrate the reasonableness of its charges, and it adjusted the reimbursement when it was able to do so. This evidence creates a genuine issue of material fact as to whether USAA is using the RF Methodology without performing an individualized assessment of the reasonableness of its charges in light of its insureds' needs. We conclude the trial court erred in granting summary judgment to USAA on Eastside's claim.

### Summit's CPA Claims

Although Summit's claim is identical to Eastside's claim, they are not similarly situated plaintiffs. The trial court dismissed Summit's claim, concluding

---

[4] There is no indication in Folweiler that the insured had contractually agreed to the use of a computerized database to set reimbursement rates for any incurred medical expenses. Nor is there any discussion as to whether such an insurance provision is relevant to the analysis or would contravene the CPA. As this issue was not argued below, we do not reach it here.

that the final settlement order in MySpine barred its claims. We hold that under paragraph 27 of the MySpine settlement, Summit is precluded from initiating a lawsuit against USAA for its use of the RF Methodology for five years from the effective date of that settlement. The trial court correctly dismissed Summit's claims against USAA because the requisite five-year period has not passed.

We review CR 12(b)(6) dismissals de novo. FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc., 180 Wn.2d 954, 962, 331 P.3d 29 (2014). "Dismissal is warranted only if the court concludes, beyond a reasonable doubt, the plaintiff cannot prove any set of facts which would justify recovery." Kinney v. Cook, 159 Wn.2d 837, 842, 154 P.3d 206 (2007) (internal quotation marks omitted) (quoting Tenore v. AT&T Wireless Servs., 136 Wn.2d 322, 329-30, 962 P.2d 104 (1998)).

Some background on the MySpine litigation and settlement agreement is necessary to analyze Summit's arguments on appeal. In 2012, MySpine, a health care provider, brought a class action against USAA, alleging that USAA had failed to pay reasonable bills submitted by providers on PIP claims and that its use of the RF Methodology to determine reimbursement rates violated the CPA. USAA filed a CR 12(b)(6) motion arguing that the providers lacked standing to bring a claim that rightfully belonged to the insureds. The trial judge assigned to MySpine, Judge Theresa Doyle, denied that motion.

In 2015, the parties reached a class-wide settlement agreement. In September 2015, Judge Doyle entered a final order approving the class action settlement. Summit submitted a claim to the settlement administrator and did not opt out of the settlement. Under paragraph 16 of the MySpine order, Summit

- 16 -

became a "Settlement Class Member" bound by that order. Summit does not deny this fact.

Paragraph 18 of the final settlement order in MySpine provided in pertinent part:

> 18. . . . [T]he Named Plaintiffs, and all Settlement Class Members . . . have conclusively compromised, settled, discharged, and released all Released Claims against the USAA Entities and . . . are bound by the provisions of the Settlement Agreement.

Those "Released Claims" include all claims that were raised or that could have been raised with respect to any conduct "prior to the Effective Date" of the settlement. The final order does not define "Effective Date," but USAA states the settlement class closed as of May 29, 2015, which explains why Summit's alleged class period begins on May 30, 2015. If May 29, 2015 is the "Effective Date" of the MySpine settlement, then Summit has released any claims against USAA that predate May 2015. Summit does not challenge this contention.

Instead, Summit argues the order approving the MySpine settlement permits it to challenge USAA's use of the RF Methodology after the effective date of the agreement. This argument requires the court to interpret paragraphs 26 through 29 of the MySpine settlement order. Paragraph 26, 27 and 28 provide in pertinent part:

> 26. The USAA Entities have represented that they are currently using the "RF Methodology" as a tool to assist in paying Personal Injury Protection ("PIP") and Medical Payments (MedPay) claims in Washington for "reasonable and necessary" medical expenses. . . . The USAA Entities also have represented that they may in the future amend the RF Methodology . . . (the "Amended RF Methodology").
>
> 27. The USAA Entities have the option (but are not obligated) to continue using the RF Methodology or any Amended RF

Methodology. The use of the RF Methodology and any Amended RF Methodology as a tool in paying PIP and MedPay claims does not in and of itself breach any duty or obligation under any applicable law or contract requiring the USAA Entities to pay or reimburse "reasonable and necessary" charges for covered treatment. So long as the USAA Entities use the RF Methodology or the Amended RF Methodology, the Named Plaintiffs and the Settlement Class Members shall refrain for five (5) years after the Effective Date from asserting that USAA Entities' use of the RF Methodology or Amended RF Methodology is, in and of itself, a violation of law or a breach of any duty or obligation under any applicable law or contract requiring the USAA Entities to pay "reasonable and necessary charges" for covered treatment.

28. The USAA Entitles shall be free to use the RF Methodology or any Amended RF Methodology as a tool in paying PIP and MedPay claims in Washington, and shall be free to pay a health care provider's bills (subject to the applicable coverage limit and any other policy provisions) for a covered treatment as follows: . . . (d) the lesser of (i) the actual amount billed or (ii) the amount recommended by the RF Methodology or Amended RF Methodology.

Paragraph 29, however, permits any "Person" to challenge underpayments on a case-by-case basis:

29. However, nothing in Paragraphs 26-28 above shall be construed as waiving any claim by any Person that the USAA Entities' past, present, or future use of the RF Methodology . . . in the intended or any particular way results in the USAA Entities' failing to pay "all reasonable and necessary" medical expenses as required by Washington law and/or results in the USAA Entities' failing to fulfill any duties or obligations to comply with any and all insurance regulations or law when paying Washington PIP and MedPay claims and any such Person shall be free to assert such claims against the USAA Entities.

Summit contends that under paragraph 29, it is a "Person" who may claim that USAA is not paying all reasonable and necessary medical expenses, and that under paragraph 28, it may allege that USAA is using the RF Methodology not as "'a tool' in paying PIP claims, [but is instead using it] as the *exclusive and sole* means for denying full payment of reasonable bills."

- 18 -

This argument, however, would render the clear and unambiguous language of paragraphs 27 and 28 of the MySpine settlement order meaningless or superfluous and also ignores Summit's own characterization of its CPA claim in this lawsuit.

First, paragraph 27 explicitly states that USAA may continue to use the RF Methodology. Paragraph 28 explicitly provides that USAA may pay providers the lesser of the actual amount billed or the amount recommended by the RF Methodology. It also clearly states that as long as USAA complies with these provisions, no Settlement Class Member can initiate a lawsuit to claim that its use of the RF Methodology violates the CPA for a period of five years. There is no evidence in the record that USAA paid Summit in any manner other than as permitted in paragraph 28.

Settlement agreements are interpreted the same way as contracts. McGuire v. Bates, 169 Wn.2d 185, 188, 234 P.3d 205 (2010). An interpretation of a contract which gives effect to all of its provisions is favored over one which renders some of the language meaningless or ineffective. Wagner v. Wagner, 95 Wn.2d 94, 101, 621 P.2d 1279 (1980). If we were to interpret paragraph 29 as permitting Summit's lawsuit here, it would render superfluous its agreement not to bring suit against USAA for using the RF Methodology for five years. We agree with the trial court that the reference to "Person" in paragraph 29 cannot extend to Settlement Class Members because it would essentially write out of the settlement order the explicit five-year litigation bar applicable to the Settlement Class Members. Courts do not have the power, under the guise of interpretation, to

rewrite contracts which the parties have made for themselves. Riley v. Iron Gate Self Storage, 198 Wn. App. 692, 701, 395 P.3d 1059 (2017).

Summit argues that Judge Doyle made it clear in paragraph 17 of her order, when overruling an objection lodged by an insured, that the settlement agreement did not immunize USAA from compliance with Washington law. It contends the trial court ignored paragraph 17 and essentially "rewrote" paragraph 29 of the MySpine order. We disagree.

Paragraph 17 laid out the court's reasoning for overruling three objections the court had received to the class action settlement. In subparagraph (c), the court stated:

> The third objection was submitted by an attorney . . . on behalf of an Insured Class Member, Kristen Overlees. The objection essentially asserts that . . . the Settlement Agreement immunize[s] the USAA Entities from having to comply with Washington law and pay a reasonable fee to a provider or insured. This characterization of the Settlement is incorrect. The Settlement does not immunize the USAA Entities from having to comply with Washington law and pay a reasonable fee to a provider or insured.

But we do not interpret paragraph 29 as immunizing USAA from suit. Indeed, it merely provides that Settlement Class Members cannot sue for a specified period of time—five years. We see no inconsistency in paragraph 17 and our interpretation of paragraph 29.

Second, in this lawsuit, Summit is alleging exactly what it agreed it would not claim during that five year period. In the Amended Complaint, Summit alleges that USAA's RF Methodology is *systematically* flawed and always results in an unlawful underpayment:

> 3.76   USAA's practices of making automatic RF_3 Reason Code reductions to the bills submitted by the putative Class of 1,100

Washington providers were a mere sham used by USAA to avoid its affirmative duty to pay all reasonable medical expense bills submitted and to conduct a reasonable investigation of the provider's PIP claim for reimbursement before denying full payment. The practices were a mere sham because USAA's practices systematically, consistently and repeatedly underpaid providers and resulted in USAA systematically, consistently and repeatedly failing to make "payments of all reasonable" medical expenses under its PIP policy as required by the Washington PIP statute.

Moreover, Summit and Eastside are now relying on Folweiler for the proposition that USAA's use of the RF Methodology is, in and of itself, an unfair practice under the CPA. These allegations are inconsistent with Summit's agreement, as set out in the MySpine settlement order, not to challenge this practice for a period of five years.[5] If Summit did not wish to participate in the MySpine settlement, it could have opted out. It chose not to do so. It is thus bound by the five-year litigation bar.

Because the final settlement order in MySpine unambiguously precludes Summit from bringing suit against USAA based on its use of the RF Methodology for a period of five years, the trial court properly dismissed Summit's claim.

## Motion to Transfer

Finally, Eastside and Summit argue that the trial court abused its discretion when it denied their motion to transfer this case from the assigned judge to Judge Doyle, the King County Superior Court judge who signed the final settlement order in MySpine. We reject this argument.

---

[5] Summit argues that USAA is judicially estopped from arguing that the MySpine order bars its claims. This legal argument was not made below, and we decline to address this argument. See Roberson v. Perez, 156 Wn.2d 33, 39, 123 P.3d 844 (2005) ("In general, issues not raised in the trial court may not be raised on appeal.") Summit argued collateral estoppel, not judicial estoppel, before the trial court. But Summit has not raised this argument on appeal and has thus waived it. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (assignment of error waived when party fails to present argument in opening brief).

Eastside and Summit acknowledge that a motion to reassign a case is reviewed for an abuse of discretion. See Russell v. Marenakos Logging Co., 61 Wn.2d 761, 765, 380 P.2d 744 (1963). An appellate court will find an abuse of discretion only "on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). A trial court's discretionary decision "based 'on untenable grounds' or made 'for untenable reasons' if it rests on facts unsupported in the record or was reached by applying the wrong legal standard." State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003). A trial court's exercise of discretion is manifestly unreasonable if the court adopts a view that no reasonable person would take. Id.

Although Eastside and Summit argued below that Judge Doyle had "retained jurisdiction" to interpret and enforce the MySpine order, it does not advance that argument on appeal. Instead, it merely contends that reassigning the matter to Judge Doyle would "greatly promote[] judicial efficiency and fairness." But deciding that a case transfer will promote judicial efficiency is a matter we leave entirely in the hands of the trial court to evaluate. The King County Local Rules vest the decision to transfer a case from one judge to another in the Chief Civil Judge. KING COUNTY SUPER. CT. LOCAL CIV. R. 42(a). At any given time, trial judges may be assigned to preside over a trial or to a particular calendar that does not permit them to receive and preside over a new civil case, even one raising similar issues as a judge has handled previously. We conclude that the court was within its discretion to decide that the assigned judge was just as able to interpret the

terms of the final settlement order as was Judge Doyle. Thus, the trial court did not abuse its discretion in denying the motion to transfer.

## CONCLUSION

We conclude that the trial court correctly dismissed Summit's CPA claim against USAA because the MySpine final settlement order bars Summit from challenging the RF Methodology for five years. We also conclude that the trial court did not abuse its discretion when it denied Eastside's and Summit's motion to transfer the case from Judge Linde to Judge Doyle. But we conclude Folweiler requires the reversal of the summary judgment dismissal of Eastside's CPA claim. We remand that claim for proceedings consistent with this opinion.

Affirmed in part, reversed in part.

WE CONCUR: